Opinion issued February 5, 2019



In The

# Court of Appeals

For The

## First District of Texas

————————————

### NO. 01-18-00729-CV

————————————

### IN THE INTEREST OF R.J, JR., A CHILD

---

**On Appeal from the 344th District Court**
**Chambers County, Texas**
**Trial Court Case No. CV29910**

---

## O P I N I O N

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between E.M. ("Mother") and R.J., Sr. ("Father") and their three-year-old son, "Ray."[1] The trial court also appointed the Texas Department of

---

[1]     We use pseudonyms to refer to the subject child, parents, and other family members involved in this case. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

Family and Protective Services ("the Department") to be Ray's permanent managing conservator.

Father and Mother appeal, filing separate briefs. Father presents four issues, and Mother presents two issues. Both assert that the trial court should have dismissed the suit under Family Code Section 263.401(a) because the court did not timely commence trial as required by the statute. Both also challenge the sufficiency of the evidence to support the trial court's findings that termination of the parent-child relationship was in Ray's best interest. In addition, Father challenges the sufficiency of the evidence supporting the trial court's statutory predicate finding. He also asserts that the trial court erred in appointing the Department as Ray's permanent managing conservator. Because we conclude that the trial court timely commenced trial as statutorily required, legally and factually sufficient evidence supports the challenged findings, and Father does not have standing to challenge the conservatorship appointment, we affirm the trial court's judgment.

**Factual and Procedural Summary**

*Filing of the Suit and Ray's Removal*

Ray was born on January 4, 2015. On February 6, 2016, the Department filed suit against Mother and Father in Chambers County. It requested the trial court to issue temporary orders appointing the Department as Ray's temporary managing

conservator. The Department sought to terminate Mother's and Father's parental rights to Ray if family reunification could not be achieved.

To support its request to be named Ray's temporary managing conservator, the Department offered the affidavit of its representative, S. Sanders.[2] In her affidavit, Sanders testified that on January 5, 2015—the day after Ray was born— the Department received a report that Mother had tested positive for synthetic marijuana during her pregnancy with Ray. Sanders stated that the Department received another report in May 2015, indicating that Mother and Father were abusing drugs around then-five-month-old Ray and that the baby was "exhibiting signs of poor hygiene and possible malnourishment."

Sanders described that, over the next eight months, the Department offered Mother and Father family-based safety ("FBSS") services, which permitted Ray to stay in his parents' care while they received services to address issues creating an unsafe home for Ray, including their drug use and Father's mental health issues. However, even after services were provided to them, the parents continued to test positive for illegal drugs and failed to engage in services.

Sanders indicated in her affidavit that Mother and Father also struggled with homelessness. During the period they were receiving family-based-safety services,

---

[2] The affidavit was not offered into evidence at trial but is referenced for background purposes to show what was offered to support Ray's removal.

3

Mother, Father, and Ray began living with one of the parents' grandmothers. Because of their continued drug use and noncooperation with services, Mother and Father were asked by the Department to leave the grandmother's home in October 2015, leaving Ray in the grandmother's care. Sander's affidavit indicated that, over the next several months, Mother and Father continued to be noncooperative with engaging in services and continued to use illegal drugs.

On February 11, 2016, the trial court signed an order naming the Department as Ray's temporary managing conservator. The court also signed an order requiring Ray to remain in his grandmother's home.

*Family Service Plans and Subsequent Events*

The Department developed family service plans for Mother and Father. The trial court incorporated the plans by reference in a status-hearing order, making both plans orders of the court. Each plan listed tasks and services to be completed by the parents for reunification with Ray to occur. Specifically, the plans required the parents to (1) support Ray to the best of his or her ability, including the child's financial, emotional, medical, educational, and social needs; (2) submit to random drug tests; (3) attend all hearings and parental conferences; (4) obtain employment and provide pay receipts; (5) attend all visitations with Ray and confirm attendance 24 hours in advance; (6) submit to random drug testing; (7) cooperate completely with and provide all information required to the Department; (8) not interrupt Ray's

4

placement; (9) notify the Department within 48 hours of any change of address or phone number; (10) provide safe, appropriate housing free of any illegal substances, and provide proof of lease or purchase and proof of payment of rent or mortgage; (11) not commit any criminal act and resolve all warrants; and (12) complete a psychological assessment.

Each plan also listed service plan goals and stated that it was intended to help the parent provide a safe environment for Ray. The plans warned that, if the parent was unwilling or unable to provide that safe environment, parental and custodial duties and rights could be restricted or terminated.

In March 2016, Father was charged with the misdemeanor offense of possession of under two ounces of marijuana. The information also stated that Father had previously been convicted of felony assault in 2013. Father pleaded guilty to the misdemeanor offense and received 10 days in jail. While visiting Father in jail, Mother was arrested on an outstanding warrant for theft of services.

In April 2016, the trial court signed an order placing Ray with his maternal aunt. The following month, in May 2016, Mother gave birth to a girl, "Jane." The Department filed suit in Harris County, seeking to terminate the parent-child relationship between Mother and Jane and Father and Jane.

In June 2016, the Department determined that Ray could not remain in the maternal aunt's home because a person living in the home, the aunt's boyfriend, had

been accused of sexually abusing a family member. Ray was removed from the home and placed with a non-relative foster family.

Around this time, Father also attempted suicide.

In October 2016, the Department evaluated Mother's progress under the family service plan. The evaluation indicated that "[t]here has been absolutely no changes that would significantly mitigate or reduce the risk to [Ray]." The Department indicated that "[Mother] continues to move from place to place. [Mother] cannot maintain steady employment. [She] continues to live with [Father] knowing he is refusing to take urine tests. [Mother] cannot support herself or her family."

In December 2016, Mother and Father each signed an "Affidavit for Voluntary Relinquishment of Parental Rights." The affidavits had been prepared by an attorney representing the Smiths, a couple Mother and Father had known for three years.[3] The Smiths were friends of Mother and Father, and Mrs. Smith had at times babysat Ray. In the affidavits, Mother and Father agreed to relinquish their parental rights to Ray and Jane and designated the Smiths as the children's "prospective adoptive parent[s]."

The attorney who prepared the affidavits had been hired by the Smiths to assist in the adoption and to intervene, at least, in the Chambers County suit involving Ray.

_____

[3] Smith is a pseudonym.

6

*Case Called to Trial January 17, 2017*

On January 17, 2017, the trial court called the case to trial. The court asked all testifying witnesses to raise their right hand, and the record indicates that witnesses were sworn. The trial court then asked for announcements. All the attorneys involved, including the attorney ad litem for Ray and the attorneys representing Mother, Father, and the Department announced that they were ready to proceed. Ray's court appointed special advocate (CASA) guardian ad litem was in court and said that she was "ready." Also present was the attorney for the Smiths, representing them as would-be intervenors. He announced ready as well. The Department's attorney objected to the Smith's attorney "doing any question and answer" when no intervention had yet been filed. The trial court stated that the Smith's attorney had "just asked" to file the intervention. The trial court then told the Department to call its first witness. The Department called its caseworker, C. Karachiwala. After brief questioning, the trial court said, "We're recessed."

The case was set again for trial in March 2017, but Father moved for a continuance. The case was set again in October 2017. The trial court's order setting the October trial stated that the court "finds that this case is currently in trial recess." Father again requested a continuance.

The Department filed a written objection to Father's motion for continuance of the October setting. To support its objection to delaying trial, the Department

7

pointed out that the case had already been set for final hearing three times: trial had been started and recessed after all parties announced "ready" on January 17, 2017, trial was reset to continue March 29, 2017, but had been continued again and reset to resume on October 30, 2017. The Department also asserted that Father had been given adequate time to comply with his service plan.

### Mother's and Father's Parental Rights Terminated to Ray's Sister, Jane

Meanwhile, in the summer of 2017, the Harris County case involving Ray's younger sister, Jane, proceeded to trial. Ultimately, on August 23, 2017, the trial court rendered judgment, terminating Mother's and Father's parental rights to Jane. Among the Harris County court's findings supporting termination was its determination that Mother and Father had (1) knowingly placed Jane in surroundings endangering her well-being under Texas Family Code Section 161.001(1)(D) and had (2) engaged in conduct endangering Jane's well-being under Section 161.001(1)(E). The Harris County court also found that termination was in Jane's best interest. Mother and Father appealed to this Court, and we affirmed the Harris County decree.[4]

### New FBSS Case Opened Less Than Two Months Before Final Hearing

On October 10, 2017, Mother gave birth to a baby boy, Alex.

---

[4] *See In re D.S.J.*, No. 01–17–00678–CV, 2018 WL 1003635, at *10 (Tex. App.— Houston [1st Dist.] Feb. 22, 2018, pet. denied) (mem. op.).

In April 2018, Mother reported an incident of domestic violence between her and Father. Six-month-old Alex was in their care at the time. Mother also reported that Father had been drinking at the time of the incident. As result of the incident, an FBSS case was opened regarding Alex. Mother agreed to engage in services, and the Department developed a safety plan for Alex, permitting the baby to stay with Mother. However, the safety plan required Father to leave the home. Father was permitted to return home in early June 2018.

### *Final Hearing on June 18, 2018*

On June 18, 2018, the trial court called the case for the final hearing in the trial. Father moved for a continuance, which was denied.

To support termination of Mother's and Father's parental rights, the Department asserted in its live petition that termination was in Ray's best interest. The Department also asserted, as a predicate ground, that Mother's and Father's parental rights to Ray should be terminated because each parent had previously had his and her parental rights terminated to another child based on findings of endangerment.

At trial, Mother testified that she had a total of six children: the three children she had with Father—Ray, Jane, and Alex—and three older daughters, who were ten, seven, and five years old. Mother's three older daughters are not Father's biological children but, at the time of trial, lived with Mother and Father in a home

9

they rented in a small town near Corpus Christi. Until August 2017, Mother's three older daughters had lived with their maternal grandmother.

Testimony and documentary evidence showed that Mother's and Father's parental rights to Jane were terminated in the Harris County case based on findings of endangerment under Family Code Sections 161.001(1)(D) and 161.001(1)(E). This Court's judgment, affirming the Harris County termination decree, was admitted into evidence.

### *Evidence of Parents' Drug Use*

Mother and Father also testified about their drug use. Mother confirmed that she used marijuana while she was pregnant with Ray, and she agreed that smoking marijuana while pregnant endangers a baby. She also acknowledged that the Department's investigation began when it learned that she had tested positive for marijuana when she was 20-weeks pregnant with Ray. Mother admitted that Ray had then been placed in a parental child safety placement and that she was initially provided with family-based safety services because she was using, and tested positive for, synthetic marijuana. Mother acknowledged that she continued to use and to test positive for marijuana during the FBSS case. However, Mother testified that she had not tested positive for marijuana since October 2015. She also introduced into evidence certificates showing that, in February 2018, she completed an outpatient drug treatment program and another program entitled "Purple Door."

10

Father also acknowledged that he had tested positive for synthetic marijuana several times "at the start of [Ray's] case." Father admitted to using marijuana in the summer of 2016 and to using ecstasy "once or twice" during that time. He testified that around that time he "fell for cocaine." He denied that he had a positive drug test for cocaine, but he acknowledged that the caseworker told Mother that he had tested positive for cocaine. Father also admitted that, a month after Jane was born in May 2016, he had used benzodiazepine, marijuana, amphetamine, and methamphetamine.

Father claimed that he had not used drugs or had a positive drug test for about two years. Father also offered into evidence a certificate showing he completed an outpatient drug treatment program in May 2017.

Regarding his criminal history, Father confirmed that he was arrested for marijuana possession in March 2016. The Department offered into evidence the information charging Father with the misdemeanor offense of possession of marijuana. The information also indicates that Father was convicted of the felony offense of assault in 2013. The evidence showed that Father pleaded guilty to the marijuana offense. He was sentenced to ten days in jail and had his driver's license suspended for six months. Mother also testified that she had been arrested for the offense of theft of services while visiting Father in jail.

11

*Mental Health Issues*

Evidence was presented regarding Father's mental health issues. Father testified that, in the past, he had taken three different medications for "PTSD, anxiety and sleeplessness." When asked if he had any mental health issues, Father responded, "Not anymore." He testified he was "perfectly fine" and claimed that his doctor had taken him off all his medication. He acknowledged that he had attempted suicide in July 2016 and that he had not been taking his medication at that time. However, he indicated that the suicide attempt was not caused by his lack of medication; rather, he stated that his use of illegal drugs led to the suicide attempt.

Father testified that he had been seeing the same mental health doctor for two years. When asked again if he was taking medication, Father testified, "I'm on something for sleep and something for anxiety. . . . I'm off all the PTSD meds and all that stuff."

Father acknowledged that he signed a family service plan (which was also admitted into evidence) that required him to complete a psychological assessment, but, at the time of trial, he had not completed the assessment.

Mother also acknowledged that she had failed to complete a psychological assessment as required by her family service plan, which was admitted into evidence. Mother claimed that her caseworker recently told her she did not need to complete the assessment because the case was about to go to trial.

*Recent Domestic-Violence and Alcohol Use*

In addition, the witnesses were questioned about the recent incident of domestic violence between Father and Mother, occurring in April 2018, less than two months before the final hearing. Mother admitted that she told the Department's investigator that Father had pushed her, causing her to fall into a recliner and to then kick Father. But then Mother testified that she had lied about the incident to the investigator. When asked why she would tell the investigator that Father had committed family violence against her Mother responded, "Honestly, I don't know." When asked if Father had been drinking on the day of the alleged incident, as Mother had reported, she said that he had been drinking. She claimed that Father stopped drinking after the incident.

Mother admitted that their baby, Alex, was home at the time of the reported incident. She acknowledged that the Department had opened a FBSS case and developed a safety plan for Alex because of the incident, which required Father to leave home. She acknowledged that the FBSS case regarding Alex was still open at the time of trial.

Mother testified that she and Father had been together for five years. When asked if she intended to continue her relationship with him, she said that she did.

Father acknowledged the domestic-violence incident, testifying that there was an allegation that he or Mother or both "put [their] hands on each other." He stated

that, at the time of the incident, he and Mother were arguing. Father testified that the police were called and came to their home. He also acknowledged that he had been drinking that night but claimed that had been the only time he had consumed alcohol in over a year and a half. Father testified that the incident was "a one-time thing" and indicated that it occurred because he had "a couple of beers." He said that it would not happen again and that he had not had a drink since the incident.

Father also acknowledged that he had been required to leave the home after the incident and was not allowed to live there for two months. He said that he "didn't get to come back [home] until a week and [a] half ago."

Mrs. Smith testified that, on the night of the domestic-violence incident, Mother had called her crying. Mother asked Smith to come get Alex because "[Father] had been drinking, and they were fighting." Smith said that she went to the home and picked up Alex. Smith testified that this was not the first time Mother had told her about such an incident with Father. Smith stated that Mother and Father's relationship was "[a]bsolutely not" a healthy one.

When she was told that Father testified the only time he had alcohol since the case was pending was the day of the domestic incident, Smith responded, "That's a lie." She testified that she had seen Father drinking over the past two years. When asked whether she had seen him drink excessively, Smith responded that Father always drinks to excess.

*Condition of Mother's and Father's Home*

Father offered into evidence photographs of his and Mother's home taken two weeks before the domestic-violence incident. The photos depicted an orderly appearing home. However, when shown the photos, Smith said that the home looked nothing like that on the night of the incident.

Smith said that, when she went to the house to get Alex on the night of the incident, the home was "disgusting." She said there was "stuff everywhere," and she could "barely see the floor." Smith further testified, "There was stuff all over the kitchen counter. There were dirty dishes that had sat on the kitchen counter so long, there were baby roaches on it. The sink had dishes all in it. There was beer bottles or beer cans on the floor. . . ." Smith testified that she also saw a beer can in Alex's "baby bed."

Smith indicated that she had often babysat Alex. She testified that every time Alex came to her house she had to bathe him "[b]ecause he was filthy. There were dead roaches in his diaper bag. He smelled like smoke."

Smith testified that she and her husband no longer had a relationship with Mother and Father after the domestic-violence incident. She testified that they told Mother that she needed to make Father leave the house. Smith testified that she and her husband "had enough." Smith indicated that she had not spoken to Mother since the incident.

15

*Voluntary Relinquishment*

Smith also testified about the affidavits of relinquishment signed by Mother and Father, which were admitted into evidence. In the affidavits, Mother and Father agreed to voluntarily relinquish their parental rights to their children, Ray and Jane, to the Smiths. Smith stated that she and her husband had hired an attorney two years earlier to assist with adopting the children. She testified that Mother and Father told her they wanted the adoption "[b]ecause they knew they couldn't take care of their kids." However, the record shows that the adoption did not move forward. And, while there was an indication that the Smiths had planned to intervene in the suit, they never filed an intervention.

Mother and Father also testified about the relinquishments. They both claimed that they had been told by the Smiths' attorney that signing the affidavits would help them get custody of their children. Smith testified that the affidavits had not been a means for the parents to obtain custody of the children. Rather, she testified, "Their family came to me and asked . . . me and my husband to adopt them, because [Mother] and [Father] were not good parents."

*Parents' Minimal Visitation*

The parents' service plans required them to attend all visitations with Ray and to confirm their attendance 24 hours in advance. Caseworker, C. Karachiwala, testified that Mother and Father attended only 10 out of a possible 55 visitations with

16

Ray during the case. Karachiwala stated Mother and Father provided a valid reason for missing only two visits, but they did not notify her regarding the other missed visits. L. Ledzinger, Ray's guardian ad litem and court appointed special advocate (CASA) testified that, although Mother and Father visited more regularly in 2018, they visited Ray only twice in 2016 and only twice in 2017.

Karachiwala testified that she took Ray to the visits with his parents. She said Ray did not want to attend the visits and would hide behind his foster mother when Karachiwala would pick him up. After visits, Ray would be "upset." He would ask why he had to go to visits. Karachiwala testified that Ray does not know Mother and Father as his parents, and he does not call them "mom" and "dad."

Karachiwala testified that she attended most of the visits and that a couple of the visits concerned her. She stated that, during the April 2018 visit, Father was upset and walked away when Ray came up to him. She observed that Mother stayed on her phone, and neither of them paid attention to Ray.

Mother's and Father's testimony indicated that they had missed visits because Karachiwala would not cooperate with them on scheduling visitation that worked with their employment schedules. However, Karachiwala testified that Mother and Father did have input into their visitation schedule, but neither had told her that their employement schedules conflicted with visitation.

17

Mother and Father also testified that Karachiwala knew visitation was difficult because they lived five hours away from Ray and had transportation issues. The parents had recently acquired two vehicles but, for most of the time the case was pending, did not have their own transportation. However, the evidence showed that it was Mother's and Father's choice to move five hours away from Ray.

Mother acknowledged that they had lived in Chambers County when the case began. She testified that they chose to move five hours away because "it was a better environment." Father indicated that he believed that the small town they lived in was a safe environment to raise children. Father stated that he and Mother were saving to buy the house they were renting. He testified that the house was near the school, library, and police station. Father offered photographs of the house and their neighborhood. He also offered evidence showing that they had paid utility bills.

The parents testified that they both worked at a restaurant that was not far from their home. Mother works as a floor manager, and Father works as a cook. Father indicated that these are good jobs because they provide health insurance and a 401k plan. Mother testified that their work schedules allow for one of them to always be home with the children.

The Department presented evidence indicating that the parents' lack of visitation had detrimental effects on Ray. His foster mother, "Linda," testified that

the parents' "sporadic" visitation had recently—as he had gotten older—caused Ray "anxiety" and substantial "uncertainty."

In January 2018, Ray's counselor wrote, in a letter admitted into evidence, that she could "see apprehension in [Ray's] eyes" when the visits with Mother and Father approached  She said, in her professional opinion, Ray's visits with Mother and Father were "unhealthy" for him, "confused" him, and caused him to have "definite behaviors exhibiting anxiety and stress which are harmful for any child especially at this age."  The counselor recommended that the visits stop until Ray could be assessed to determine when he might be ready to visit his parents.

### Ray's Current Foster Placement

Ray's foster mother, Linda, testified that Ray had been placed with her family two years before the final hearing.  Linda stated that, when he came into her care, Ray had developmental and cognitive delays.  She noticed Ray had "issues with eating, motor skills, balance, and . . . communication."  She was "really concerned" because Ray did not have "any communication skills" so he could not tell her how he was feeling.

Linda testified that she had Early Childhood Intervention (ECI) evaluate Ray. She said that Ray received therapies from ECI for one year.  ECI also trained Linda and her husband how to work with Ray on different skill sets.  She said that they continue working every day with Ray to improve his balance and motor skills.

Linda testified that she does not work outside the home. She stated she has two other children, five and seven years old. She stated that she homeschools her children part-time and that they attend school part-time. She said that she plans the same for Ray if he remains with her family. Linda testified that she is working with Ray while she schools her children. She said Ray is "learning his ABCs, all of his animal sounds, numbers" and "working on colors," learning the "developmental skills that a preschool age child should know." When asked whether Ray is thriving in her care, Linda responded, "Absolutely. He's come a long way from where he started."

Linda stated that her family has a "very loving and sweet relationship" with Ray. She said Ray "adores" her, her husband, and their other children. Linda stated that Ray has "familiarity and comfort" with her. She said that he "feels safe and secure" in her care. Linda testified that Ray has adjusted to her family "really well." She said, "As far as he knows, he's just part of our family like the other children."

Linda testified that, if parental rights to Ray were terminated, she and her husband "would love to be able to adopt [Ray] one day." She stated that Ray is "like our other children to us, and we treat him no differently." She said that they have "high expectations for his future," and they see that Ray has "a lot of potential." She testified that they "would love to make [Ray] part of our family."

20

Linda also testified that they have contact and visitations with Ray's sibling, Jane, and Jane's adoptive parents. Linda indicated that they plan to continue sibling visits between Ray and Jane.

*Trial Court's Findings and Termination Judgment*

At the end of trial, the court granted the Department's request for termination of the parent-child relationship between Mother and Ray and between Father and Ray. The trial court signed a judgment terminating Mother's and Father's parental rights, finding that termination was in Ray's best interest and that Mother and Father had each engaged in the predicate act listed in Family Code Section 161.001(b)(1)(M). Specifically, the trial court found that clear and convincing evidence showed that Mother and Father each "had [his or her respective] parent-child relationship terminated with respect to another child based on a finding that [that parent's] conduct was in violation of § 161.001 (b)(1)(D) or (E), Texas Family Code, or substantially equivalent provisions of the law of another state. pursuant to § 161.001(b)(1)(M)." The trial court also appointed the Department as Ray's permanent managing conservator.

Mother and Father now appeal the trial court's judgment.

**Commencement of Trial**

Father and Mother assert in their first issues that the case should have been dismissed under Family Code Section 263.401(a) because the trial court did not

timely commence trial within the one-year deadline as required by the statute. They contend that the trial court erred when it impliedly denied Father's April 11, 2018 motion to dismiss.[5]

Because this suit was filed in February 2016, the version of Section 263.401(a) that applies here reads as follows:

> Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

Act of May 29, 2015, 84th Leg., R.S., ch. 944, § 38, sec. 263.401, 2015 Tex. Sess. Law Serv. 3268, 3283 (amended 2017; current version at TEX. FAM. CODE § 263.401(a)).[6]

---

[5]   The record reflects that on April 12, 2018 the trial court signed an order on the motion to dismiss. The order offered a choice of granting or denying the motion, but the trial court did not select either choice when signing the order; thus, the motion was neither granted nor denied. The next day the trial court made a notation on another copy of the signed order, indicating that the order had previously been signed "in error" and stating, "case now pending in CPS court."

[6]   In 2017, the legislature amended Section 263.401(a), making the statutory deadlines set out in that provision jurisdictional. Act of May 28, 2017, 85th Leg., R.S., ch. 319, § 12, sec. 263.401, 2017 Tex. Sess. Law Serv. 716, 721 (codified at TEX. FAM. CODE § 263.401(a)). The effective date of the amendment was September 1, 2017. *Id.* § 34, at 735. The 2017 changes to Section 263.401 "apply only to a suit affecting the parent-child relationship filed on or after the effective date of this Act. A suit affecting the parent-child relationship filed before the effective date of this Act is governed by the law in effect on the date the suit was filed, and the former law is

The trial court signed a temporary order, appointing the Department as temporary managing conservator, on February 11, 2016. In November 2017, the trial court signed a "Permanency Hearing Order Before Final Order," stating that the one-year dismissal date for the case was February 13, 2017; that is, trial needed to commence by February 13, 2017 or the case would be subject to dismissal. *See id.* Although the parents assert that trial on the merits did not commence until the final hearing on June 18, 2018, the record shows that trial commenced on January 17, 2017.

On January 17, 2017, the case was called to trial. The trial court stated, "Everyone raise your right hand who's going to testify, and let's get announcements." The witnesses were then sworn. The trial court asked again for announcements. The Department's attorney, Mother's attorney, Father's attorney, Ray's attorney ad litem, and the guardian ad litem from CASA all announced they were "ready" to proceed. The attorney for the would-be intervenors, the Smiths, was also in court. He too announced "ready." The Department's attorney objected to the Smith's counsel "doing any question and answer" of the witnesses because the

continued in effect for that purpose." *Id.* § 33, at 738. Because this suit was filed in 2016, the 2015 version of Section 263.401 applies, not the 2017 amendments. *See id.*; *see also In re T.W.*, 557 S.W.3d 841, 843 n.2, 844 (Tex. App.—Amarillo 2018, pet. denied) (holding 2017 amendments to Section 263.401 did not apply to suit filed in 2016).

Smiths had not filed an intervention. The trial court responded that the Smiths' attorney had "just asked" to file the intervention. The trial court then told the Department to call its first witness. The Department called caseworker Karachiwala, who briefly testified before the trial court recessed.

The parents support their contention that trial did not commence on January 17, 2017 by asserting that "the parties were instructed they did not have to be present" on that day, and "it was clear from announcements that it was planned that the case would not proceed to trial and that other than the caseworker only attorneys were going to be present." These assertions are based on a remark made by the would-be intervenors' attorney. When asked by the trial court if the intervenors were in court, the Smith's attorney responded, "They're not here, your Honor. I believe they were told they didn't need to come to this hearing last time. It was going to be attorneys only."

We agree with the Department that this single, somewhat equivocal, statement of second-hand information by a non-party's lawyer does not establish that it was never the intent to proceed with trial that day. To the contrary, the record shows that the trial court's "Permanency Hearing Order Before Final Order" set the case for trial in early January 2017. After the case was called for trial on January 17, 2017, the trial court stated, "Everyone raise your right hand who's going to testify, and let's get announcements." Witnesses were sworn, and the parties (and the CASA

guardian ad litem) all announced they were "ready" to proceed. After the Smiths' attorney announced he was also ready to proceed, the Department's attorney objected to the not-yet intervenors participation in witness questioning. This objection indicated that questioning of one or more witnesses was anticipated that day. Finally, a witness for the Department briefly testified before the trial court recessed.

We conclude that the record contains sufficient information to establish that trial on the merits commenced on January 17, 2017. *See In re R.F., Jr.*, No. 04–17–00582–CV, 2018 WL 1308542, at *1 (Tex. App.—San Antonio Mar. 14, 2018, no pet.) (mem. op.) (holding trial commenced for purposes of Section 263.401 when record showed parties had made announcements, trial court denied motion for continuance, and the Department called a witness, who offered brief testimony before trial court recessed); *In re D.S.*, 455 S.W.3d 750, 753 (Tex. App.—Amarillo 2015, no pet.) (suggesting "commencement of trial" means, at a minimum, that parties have been asked to make their respective announcements, and trial court has ascertained whether any preliminary matters need to be considered). Because the record adequately demonstrates that trial commenced before the one-year deadline found in Former Section 263.401(a), the trial court did not err by impliedly denying Father's motion to dismiss.

We overrule Mother's and Father's first issues.[7]

## Sufficiency of the Evidence

In his second issue, Father challenges the sufficiency of the evidence supporting the trial court's statutory predicate finding underlying termination of his parental rights. In his third issue and Mother's second issue, Father and Mother challenge the sufficiency of the evidence supporting the trial court's respective best-interest findings.

### A.     Standards of Review

Termination of parental rights requires proof by clear and convincing evidence. *See* TEX. FAM. CODE § 161.001(b). This heightened standard of review is mandated not only by the Family Code but also by the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

---

[7]     The Department asserts that Mother did not preserve this issue because she did not file her own motion to dismiss. Because we have determined that the trial court did not err in impliedly denying Father's motion, whether she preserved the issue or not, Mother's issue is overruled.

Family Code Section 161.001(b) provides that "the [trial] court may order termination of the parent-child relationship if the court finds by clear and convincing evidence" that (1) one or more of the acts enumerated in section 161.001(b)(1) was committed and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1)–(2). Although termination may not be based solely on the best interest of the child as determined by the trier of fact, *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), "[o]nly one predicate finding under section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, and termination is found to be in the best interest of the child, we will affirm on any one predicate ground because only one is necessary for termination of parental rights. *In re G.A.A.*, No. 01–12–01052–CV, 2013 WL 1790230, at *7 (Tex. App.—Houston [1st Dist.] Apr. 25, 2013, no pet.) (mem. op.). Here, the Department was required to establish, by clear and convincing evidence, that Mother's and Father's actions satisfied one of the predicate grounds listed in Family Code Section 161.001(b)(1) and that termination was in Ray's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)–(2).

When determining legal sufficiency, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier

27

of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been not credible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient for the fact finder to reasonably form a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in

28

favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

We are mindful that the natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21; *see also In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26; *see also In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013).

## B. Subsection (M) Finding

In his second issue, Father challenges the sufficiency of the evidence to support the trial court's finding under Family Code Subsection 161.001(b)(1)(M).

Father asserts that the trial court should not have permitted the Department to use the Harris County decree—terminating Father's parental rights to Jane—and this Court's judgment—affirming the Harris County decree—to prove the elements of Subsection (M).

Family Code Subsection 161.001(1)(b)(M) provides that the trial court may terminate the parent-child relationship if the parent has "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." TEX. FAM. CODE § 161.001(b)(1)(M). Here, the Harris County decree contains a finding that Father endangered Jane both by placing her in unsafe conditions under Subsection 161.001(b)(1)(D) and by engaging in endangering conduct under Subsection 161.001(b)(1)(E). Father appealed the decree to this Court, and we affirmed.

At trial, the Department offered into evidence a certified copy of the Harris County decree and a copy of this Court's judgment affirming the decree. Father's counsel objected to both the decree and our judgment. Without further explanation or argument, Father objected that the "proper predicate" had not been laid for either the Harris County decree or our judgment to be admitted. The trial court overruled the objections and admitted the decree and our judgment into evidence.

On appeal, Father disputes whether the Harris County decree and our judgment affirming the decree could be used to prove that Father's parental rights to Jane were previously terminated under Subsections (D) and (E). He points out that his petition for discretionary review of this Court's judgment was still pending in the Supreme Court of Texas on the day that the trial court signed the judgment in this case. The supreme court denied his petition for review four days after the trial court signed its judgment in this case. Although he made no mention of the pending petition for review in the trial court, Father now asserts that, because the petition for review was pending in the supreme court, the Harris County decree, and hence the termination regarding Jane, was not final and could not be used to support termination in this case under Subsection (M).

As part of this issue, Father asserts that the trial court should have granted his failure-to-lay-proper predicate objection to the Harris County decree and to our judgment because the Department did not show that the decree was final. However, Father neither mentioned the pending petition for review in the trial court, nor did he argue that the Department had not laid the proper predicate because the petition for review was pending. Instead, Father generally objected that the proper predicate had not been laid.

To preserve a complaint for appellate review, a party must state an objection clearly and with sufficient specificity to make the trial court aware of the particular

grounds for the complaint. *See* TEX. R. APP. P. 33.1(a); *McKinney v. Nat'l Union Fire Ins. Co.*, 772 S.W.2d 72, 74 (Tex. 1989). Here, Father's general objection that the Department had not laid a proper predicate was not specific enough to preserve the alleged error he now complains of on appeal. *See Walden v. City of Longview*, 855 S.W.2d 875, 878 (Tex. App.—Tyler 1993, no writ) (holding objection that party failed to lay proper predicate for introduction of statement into evidence was too general to preserve error); *see also Schreiber v. Cole*, No. 07-13-00361-CV, 2015 WL 2400242, at *5 (Tex. App.—Amarillo May 19, 2015, no pet.) (mem. op.) (holding that objection that evidence was inadmissible because "it's not been proved up" was not specific enough to preserve error).

We must also address Father's assertion that the Harris County decree and our judgment are insufficient evidence to establish the prior termination of Father's parental rights to Jane because the Harris County decree was not final until the supreme court denied Father's petition for review. We addressed a nearly identical issue in *In re A.C.*, 394 S.W.3d 633 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

There, a mother claimed that a decree, terminating her parent-child relationship with other children based on findings that she violated Subsections (D) and (E), could not be used to establish the Subsection (M) ground because the prior termination decree was pending on appeal and therefore not necessarily final. *Id.* at 640. We recognized that "finality, in the sense of a complete exhaustion or waiver

32

of all possible appellate remedies, is not expressly required by the text" of Subsection (M). *Id.* We also recognized that the "mother's appeal of the prior termination decree did not suspend the effect of that decree." *Id.* (citing TEX. FAM. CODE § 109.002(c) ("An appeal from a final order, with or without a supersedeas bond, does not suspend the order unless suspension is ordered by the court rendering the order.")). We determined that "the prior termination decree effectively terminated [the mother's] parent-child relationship at and as of the time of the trial, despite the fact that the order was still subject to review on appeal." *Id.* at 640–41 (citing *Street v. Honorable Second Court of Appeals*, 756 S.W.2d 299, 302 (Tex.1988) (acknowledging that "a trial court judgment is final for the purposes of issue preclusion or collateral estoppel despite the pendency of an appeal")).

We then set out our holding as follows:

> The trial court admitted into evidence a prior decree that ordered termination of the mother's rights for reasons of endangerment under subsections (D) and (E). Just as a trial court's judgment is effective for purposes of precluding relitigation between the same parties on the same issues, the judgment is also effective for the purpose of presenting evidence to the factfinder of a prior termination. We hold that the statute requires no greater finality than this, and accordingly there was legally sufficient evidence to show that the mother had her rights terminated as to other children for purposes of section 161.001(1)(M).

*Id.* at 641. Based on our decision in *In re A.C.*, we hold that the evidence is legally and factually sufficient to support the trial court's Subsection (M) finding, supporting termination of Father's parental rights to Ray.

We overrule Father's second issue.

## C. Best-Interest Findings

In Father's third issue, and in Mother's second issue, each parent challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship was in Ray's best interest.

### 1. *Applicable Legal Principles*

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In *Holley v. Adams*, the Supreme Court of Texas identified factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed to make a valid finding as to the child's best interest. *In re C.H.*,

89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (citing *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.)). We may also consider the statutory factors found in Family Code Section 263.307. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at \*6 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

The evidence supporting the predicate grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *C.H.*, 89 S.W.3d at 28; *J.M.T.*, 519 S.W.3d at 269. Furthermore, in conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence. *See J.M.T.*, 519 S.W.3d at 269.

### 2.    *Analysis*[8]

We first observe that, because he was three years old at the time of trial, Ray was too young to testify about his desires. *See Holley*, 544 S.W.2d at 371–72 (factor one). However, the evidence indicates that Ray is not bonded with his parents. The

---

[8]    We have detailed and summarized much of the evidence presented at trial in the background section above.

evidence, including the testimony of caseworker Karachiwala and Ray's foster mother, shows that Ray is apprehensive about his visits with Mother and Father and displays anxiety after the visits. The counselor, who had been seeing Ray for six months, wrote in a January 2018 letter that she believed Ray's visits with his parents should be suspended until a further assessment could be made. She indicated that, given Ray's apprehension regarding the visits, she feared that the visits could be harmful to him. *See* TEX. FAM. CODE § 263.307(b)(5) (listing as best-interest consideration: whether child is fearful of living in or returning to child's home).

In contrast, the evidence shows that Ray is strongly bonded with his foster family with whom he has lived for two-thirds of his life. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent."). Evidence regarding Ray's foster family is supportive of the best-interest findings under the following *Holley* factors: the current and future physical and emotional needs of the child, the parental abilities of the person seeking custody, whether programs are available to assist the person seeking custody in promoting the best interests of the child, and the plans for the child by the person seeking custody. *See Holley*, 544 S.W.2d at 371–72 (factors two, four, five, and six).

36

The evidence demonstrates that Ray is thriving in foster care and that his foster parents have actively sought to meet his needs, including taking steps to remedy Ray's developmental delays through the ECI program. The evidence shows that the foster parents are providing a stable and loving home for Ray and that they treat him like one of their own children. The evidence also shows that Ray's foster family wishes to adopt him and plans to assist Ray in continuing a relationship with his sister, Jane, and her adoptive family. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of a child and affirming finding that termination was in child's best interest when child was thriving in foster care); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (considering child's bond with foster family in reviewing best-interest determination).

An inference can reasonably be made that Ray's weak bond with his parents is due, in part, to Father's and Mother's minimal and sporadic visitation with Ray during the pendency of the case. The parents' minimal visitation and lack of an emotional bond with Ray is relevant not only to the Mother's and Father's parental abilities but also to the emotional and physical needs of Ray now and in the future and to determining whether the parent-child relationship is not a proper one. *Holley*, 544 S.W.2d at 371–72 (factors two, four, and eight).

Over the pendency of the case, the parents attended only 10 out of a possible 55 visits with Ray. They provided Karachiwala with valid reasons for missing only two of the visits. CASA guardian ad litem Ledzinger testified that, although they visited more often in 2018, Mother and Father visited Ray only twice in 2016 and only twice in 2017. The evidence showed that, on their most recent visit with Ray in April 2018, neither Mother nor Father paid much attention to Ray.

The parents indicated that one of the reasons for the sporadic visitation was Karachiwala's failure to work with them on setting visitation that did not conflict with their employment schedules. *See Holley*, 544 S.W.2d at 371–72 (factor nine: any excuse for acts or omissions of the parent). However, Karachiwala testified that she had asked for input from Mother and Father regarding setting the visitation schedule.

Mother and Father also indicated that they missed visits with Ray because they lacked transportation for much of the pendency of the case to travel five hours from their home to visit Ray. *See id.* But the evidence also showed that the parents had voluntarily made the choice to live five hours away from Ray. Father indicated that he liked the small-town atmosphere where they lived and believed it was a safe environment to raise children. Mother testified that they chose to live five hours from Ray's placement because "it was a better environment" for her and "for

38

everybody." She agreed that "any hardships" she experienced travelling five hours to visit Ray was something she chose to do.[9]

The parents testified that both have jobs at a local restaurant that provides health insurance, a 401k plan, and a flexible schedule so that they do not need childcare. But neither parent testified why they could not live in a small town, and find a similar employment situation, closer to Ray to make it easier for them to visit him regularly and to form relationship with him.

Of significance, the evidence also showed an incident of domestic violence between Mother and Father less than two months before trial. Mrs. Smith testified that, at the time of the incident, Mother had called her, crying. Mother told her that she and Father were fighting, and that Father had been drinking. Smith indicated that there had been similar incidents between Mother and Father in the past. Mother asked Smith to come pick up six-month-old Alex. The police were called and came to the home.

Mother acknowledged that she told the Department's investigator that Father had committed domestic violence against her by pushing her and that she fell into a reclining chair. She said that she had then accidently kicked Father. However, at trial, Mother claimed that she had lied to the investigator, saying that she did not

---

[9]    The record indicates that Mother's sister, with whom Ray was placed at the beginning of the case, lives in the area. But, when questioned about the issue, neither parent testified that was the reason they lived where they did.

know why she had made the statement to the investigator. On the other hand, Father acknowledged that the incident occurred, testifying that it was "a one-time thing" and indicating that it had occurred because he had been drinking. Both parents also acknowledged that, because of the reported incident, an FBSS case was opened and a safety plan was developed for Alex. The FBSS case remained open at the time of trial. As part of the safety plan, Father was required to leave the home and had only recently been permitted to return. Mother also testified that she planned to remain in a relationship with Father.

Evidence of domestic violence in the home is supportive of a trial court's best-interest finding under the third, fourth, and seventh *Holley* factors: the emotional and physical danger to the child now and in the future, parental abilities, and stability of the home. *See Holley*, 544 S.W.2d at 371–72. The evidence also showed that Father had been convicted of felony assault in 2013. "Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future." *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Thus, given the evidence of domestic violence against Mother and Father's past felony conviction, the trial court was permitted to infer that Father would continue his abusive behavior in the future, further supporting the best-interest finding. *See* TEX. FAM. CODE § 263.307(b)(7), (12)(D)–(E) (providing that courts may consider whether there is history of abusive

40

or assaultive conduct by child's family or others who have access to child's home and whether adequate parenting skills are demonstrated by providing child with a safe physical home environment and protection from repeated exposure to violence); *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (stating domestic violence, even when child is not intended victim, supports finding that termination is in child's best interest).

In addition, parental substance abuse reflects poor judgment and may be a factor to consider in determining a child's best interest. *See In re J.M.*, No. 01-14-00826-CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.); *see also* TEX. FAM. CODE § 263.307(b)(8) (stating courts may consider history of substance abuse by child's family or others who have access to child's home). Here, Smith indicated that she had observed Father drink excessively during the past two years. And Father's own testimony indicated that the domestic-abuse incident occurred because he had been drinking. However, Father's and Mother's testimony also indicated that Father did not drink excessively. Father testified that he had not had a drink since the domestic abuse incident.

We note that "[i]t is well established that, in a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies." *In re D.D.D.K.*, No. 07-09-0101-CV, 2009 WL 4348760, at *6 (Tex. App.—Amarillo Dec. 1, 2009, no pet.) (mem. op.). Thus, the

trial court was free to disbelieve the parents' testimony, including their testimony downplaying Father's alcohol consumption, and to believe Smith's testimony regarding her observations.

In addition to Father's drinking, the Department presented evidence regarding Mother's and Father's illegal drug use both before Ray's birth and during the pendency of the case. Evidence relating to Mother's and Father's past involvement with illegal drugs supported the trial court's best-interest finding under the following *Holley* factors: the emotional and physical needs of Ray now and in the future and the emotional and physical danger to Ray now and in the future. *See Holley*, 544 S.W.2d at 371–72; *see also In re J.M.*, 2015 WL 1020316, at *7 (considering that parent's drug use is condition that can indicate instability in home).

Mother admitted that she used marijuana while pregnant with Ray. The evidence showed Mother tested positive for marijuana when she was 20-weeks pregnant with Ray. Mother claimed, however, that she did not know she was pregnant at the time. She also claimed that she quit using marijuana when she learned that she was pregnant. Mother admitted that she continued to use marijuana and synthetic marijuana after Ray was born and during the pendency of this case. She testified that she last had a positive drug test in October 2015, and the Department offered no evidence to contradict her testimony. In addition, Mother

42

offered into evidence a certificate showing that she had completed an outpatient drug treatment program.

Father also testified that he used marijuana with Mother while she was pregnant with Ray, and he acknowledged that he tested positive for synthetic marijuana several times "at the start of [Ray's] case." Father was charged with misdemeanor offense of possession of marijuana in March 2016. Father pleaded guilty to the misdemeanor offense and received 10 days in jail. Father admitted to using marijuana during the pendency of the case in the summer of 2016 and to using ecstasy "once or twice" during that time. And his testimony indicated that he had also used cocaine around that time. Father also admitted that, a month after Jane was born in May 2016, he had used benzodiazepine, marijuana, amphetamine, and methamphetamine. An entry from October 2016 on Mother's service plan evaluation, admitted into evidence, indicates that the Department was concerned because Mother continued to live with Father even though he was "refusing to take his urine tests," indicating that Father had been refusing drug testing at that time.

At trial, Father claimed that he had not used drugs or had a positive drug test for about two years. And he offered into evidence a certificate showing that he had completed an outpatient drug treatment program in May 2017. However, evidence of Father's past drug use, coupled with evidence that Father has been known to drink to excess in the last two years, supports an inference that Father is at risk for

43

continuing substance abuse. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (recognizing that trial court may measure a parent's future conduct by his past conduct). As mentioned, Mother testified that she plans to remain with Father, which could expose Ray to potential endangerment by Father. *See In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *19 (Tex. App.— Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) (concluding that, although he had addressed his own drug addiction, fact that father continued to stay with mother, who continued to use illegal drugs, supported trial court's finding that terminating father's parental rights was in children's best interest).

Also, relating to Father's parenting abilities and the stability of the home, we consider the Father's mental health issues. Father testified that in the past he had taken three different medications for "PTSD, anxiety and sleeplessness." When asked if he had any mental health issues, Father responded, "Not anymore." At first, he testified that he was "perfectly fine" and claimed that his doctor had taken him off all his medication. He acknowledged that he had attempted suicide in July 2016 and that he had not been taking his medication at that time. However, he indicated that the suicide attempt was not caused by his lack of medication; rather, he stated that his use of illegal drugs led to the suicide attempt.

Although he testified that he had been seeing the same mental health doctor for two years, Father provided no documentation related to his mental health

44

treatment. When asked again if he was taking medication, Father answered that he was taking "something for sleep and something for anxiety," but he stated that he was "off all the PTSD meds and all that stuff." Father acknowledged that he had not undergone the psychological assessment required by his family service plan.

While mental illness is not a ground for parental termination, the impact of a parent's mental illness on his ability to parent and the stability of the home are relevant factors in the best interest of the child analysis. *See In re T.M.D.*, No. 01–13–00970–CV, 2014 WL 1803004, at *9 (Tex. App—Houston [1st Dist.] May 6, 2014, no pet.) (mem. op.); *see also Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 281 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (considering mother's potential failure to continue taking medication prescribed for mental illness as factor in best-interest analysis). Here, evidence showed that Father has a history of mental illness and that he attempted suicide during the pendency of the case. Father testified that he is being treated for his mental illness, yet he failed to comply with the requirement in his service plan to complete a mental health assessment. Further, Father's testimony regarding whether he needs to take medication for his mental illness and whether he is taking medication is unclear. From this evidence, the trial court could have inferred that Father is not receiving adequate treatment for his mental health issues, potentially subjecting Ray to uncertainty and instability. *See In re T.M.D*, 2014 WL 1803004, at *9.

Further, "[e]vidence of unsanitary conditions of a home may support the trial court's best-interest finding." *In re S.T.G.*, No. 04-17-00837-CV, 2018 WL 1935488, at \*2 (Tex. App.—San Antonio Apr. 25, 2018, no pet.). Father offered photographs of their home, depicting it to be in an orderly condition. The parents also point out that Karachiwala responded affirmatively when asked whether the courtesy caseworkers, who went to parents' home every month, had reported that "there was no problem" and "the house was sufficient." However, Smith testified that, two weeks after Father's photos were taken, she observed the parents' home to be dirty and unsanitary. Smith testified that the home was "disgusting," and she could barely see the floor. She said, "There was stuff all over the kitchen counter. There were dirty dishes that had sat on the kitchen counter so long, there were baby roaches on it." Smith also testified that there were beer cans on the floor and a can of beer in Alex's crib. She also testified that, when she babysat Alex, she always had to bathe him when he was dropped off at her home because he would be filthy and smelled like smoke. Smith stated that she would find dead roaches in Alex's diaper bag.

Also, the evidence showed that Mother had not recently permitted the Department's representatives into her home. Mother agreed that, the same month as the final hearing, she had been "extremely aggressive" with a CPS investigator when she came to Mother's home. Mother agreed that, even though she had a duty under

her service plan to cooperate with the investigator, she had told the investigator to "get out of my fucking home." *See* TEX. FAM. CODE § 263.307(b)(10) (permitting consideration of willingness of child's family to cooperate with and facilitate an appropriate agency's close supervision). This also occurred even though Mother still has an open FBSS case with the Department regarding Alex, resulting from the domestic-abuse incident.

We acknowledge that some evidence exists in the record weighing against the best-interest findings. The record contains evidence showing that Mother and Father have taken steps to improve their lives and to be good parents. Mother and Father point to evidence showing that they had mostly complied with their service plans, they have cared for Mother's three older children since August 2017 without incident, they have a home near amenities, they are employed, the visits they did attend with Ray were appropriate, and they have plans to care for Ray. Nonetheless, evidence cannot be read in isolation; it must be read in the context of the entire record. *See In re K.C.F.*, 2014 WL 2538624, at *16. In termination cases, like elsewhere, it is within the sole province of the fact finder to weigh the credibility of witnesses. *See In re S.L.*, 188 S.W.3d 388, 394 (Tex. App.—Dallas 2006, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (stating fact finder "is the sole judge of the credibility of witnesses and the weight to be given to their testimony")). Here, the balance of the record evidence reveals

47

that Mother and Father are unable to meet the current and future physical and emotional needs of Ray; are unable to protect Ray from current and future emotional and physical danger; lack parental abilities; and lack stability.

After viewing all the evidence in the light most favorable to the best-interest findings, we conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Mother and Ray and between Father and Ray was in Ray's best interest. We also conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's findings that termination of the parent-child relationship between Mother and Ray and between Father and Ray was in Ray's best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in Ray's best interest. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship between Mother and Ray and between Father and Ray was in Ray's best interest.

We overrule Mother's second issue and Father's third issue.

**D.    Permanent Managing Conservatorship Following Termination**

In his fourth issue, Father asserts that the trial court erred in appointing the Department as Ray's permanent managing conservator.

When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *see In re J.D.G.*, No. 01-18-00578-CV, 2018 WL 6520345, at *12 (Tex. App.—Houston [1st Dist.] Dec. 11, 2018, no pet. h.). Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to an order terminating her parental rights, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination." *In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). (quoting *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)).

Because we have overruled Father's challenge to the portion of the trial court's order terminating his parental rights, the order has divested Father of his legal rights and duties related to Ray. *See* TEX. FAM. CODE § 161.206(b). Therefore, Father does not have standing to challenge the portion of the order appointing the Department as Ray's conservator. *See In re J.D.G.*, 2018 WL 6520345, at *12; s*ee also E.A. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, pet. denied) (mem. op.) (affirming termination of mother's parental rights and holding that mother, who had been divested of her legal rights to child, could not challenge conservatorship determination).

We overrule Father's fourth issue.

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Landau, J., dissenting. Dissenting opinion to follow.

50