

# IN THE
# TENTH COURT OF APPEALS

## No. 10-18-00379-CV

## IN THE INTEREST OF T.W. AND X.W.,
## CHILDREN

**From the 85th District Court
Brazos County, Texas
Trial Court No. 17-002245-CV-85**

## MEMORANDUM OPINION

After a bench trial, the trial court rendered a final order terminating the parental rights of Appellant R.W.[1] to his children, T.W. and X.W. V.A., the children's mother, executed an affidavit of relinquishment of parental rights prior to trial and does not appeal.

Randy raises two issues on appeal: (1) the evidence is factually insufficient to support the best-interest finding, and (2) the trial court erred in failing to allow him to represent himself. We affirm the trial court's termination order.

---

[1] We will refer to the father as "Randy," to the children by their initials, and to other family members by pseudonyms.

*Standard of Review*

In parental termination cases, due process requires the application of the clear and convincing evidence standard of proof. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Both legal and factual sufficiency reviews in termination cases require consideration of whether the evidence is such that a factfinder could reasonably form "a firm belief or conviction as to the truth of the allegations sought to be established." *Id. at* 264.

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* at 266.

> [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (footnotes and citations omitted); *see also In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

We give due deference to the factfinder's findings and must not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the "sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W. 3d 498, 503 (Tex. 2014). While the reviewing court must detail the

evidence relevant to the issue of parental termination when *reversing* a finding based upon insufficient evidence, it need not do so when *affirming* a verdict of termination. *Id.*

In a proceeding to terminate the parent-child relationship brought under Family Code § 161.001, the Department must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (b)(1) of § 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the Department of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate*, 72 S.W.3d at 766. Randy does not challenge the trial court's findings regarding the predicate violation under § 161.001(b)(1)(O), but only the finding that termination is in the best interest of the children.

### Best Interest of the Children

A strong presumption exists that maintaining the parent-child relationship is in a child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). But, it is also presumed that the prompt and permanent placement of a child in a safe environment is in the child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d 379, 383 (Tex. App.—Amarillo 2011, no pet.).

In determining the best interest of a child, a number of factors are considered, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist this individual; (6) the plans for the child by this individual; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 372. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.* A single factor may be adequate in a particular situation to support a finding that termination is in the best interest of a child. *See In re B.H.R.*, 535 S.W.3d 114, 123 (Tex. App.—Texarkana 2017, no pet.). We may also consider evidence supporting violation of one or more of the predicate acts in the best-interest analysis. *In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (*citing C.H.*, 89 S.W.3d at 27-28).

In regard to the desires of T.W. and X.W., all of the witnesses testified that T.W. and X.W. love Randy and want to live with him. There were never any allegations that Randy had physically harmed the children or that they were neglected.

All other issues relevant to the best interest analysis are dominated by Randy's mental health issues—his failure to acknowledge his mental illness and his failure to comply with his prescribed medication regimen. While mental illness by itself is not a ground for parental termination, the impact of a parent's mental illness on his ability to

parent and the stability of the home are relevant factors in the best interest of the child analysis. *In re R.J.*, 568 S.W.3d 734, 756 (Tex. App.—Houston [1st Dist.] 2019, no pet.). A trial court may consider a parent's mental state as endangering to a child's well-being, and a parent's lack of progress in managing his mental-health condition is relevant to the best-interest determination. *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *25 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.); *see also In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) ("While mental incompetence or mental illness alone are not grounds for termination of the parent-child relationship, when a parent's mental state allows him to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights."). Evidence that a parent is non-compliant with prescribed psychiatric medication is not consistent with providing a safe and stable environment for the children. *In re J.-M.A.Y.*, No. 01-15-00469-CV, 2015 WL 6755595, at *7 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, pet. denied) (mem. op.).

Randy did not testify at the termination hearing. All of the witnesses who did testify established that Randy has had psychiatric issues for most of his life. The trial court heard the testimony of Randy's mother, Peggy, Randy's sister, Diana, and employees from the Department of Family and Protective Services, including Christy Gatlan, an investigative supervisor, Kelly Allen, a department supervisor for the conservatorship division, and Lee Right, a CASA representative.

The investigation in this case began when the Department received a referral regarding concerns for T.W. and X.W. due to Randy's mental instability. Randy was taken to the emergency room for evaluation after he alleged that his children had placed objects in his rectum and glued his butt cheeks together. A medical evaluation did not substantiate Randy's claims, and the medical staff believed Randy should be seen by MHMR. Randy was already an MHMR client and had been prescribed medication to treat his schizophrenia. Randy had quit taking his medication, however, and there were concerns that he was becoming aggressive. Gatlan testified that "[h]e would often yell, throw things, fighting, making threats, and cursing in the home around the children."

When employees of the Department attempted to contact Randy at his residence, Randy refused to provide access to the children. The Department then did welfare checks of T.W. and X.W. at their schools and interviewed Peggy. While the investigation by the Department was continuing, Randy was involuntarily hospitalized due to his mental condition. The Department was given emergency custody of the children after a hearing. T.W. and X.W. were first placed in foster care and then placed with Diana, who was willing to care for the children on a long-term basis. When Randy was questioned on the day the children were removed, he was not threatening or assaultive. Randy admitted that he had been prescribed medication through MHMR, but was not taking the medication because he did not feel that he needed it.

Randy first exhibited symptoms of mental illness in middle school when he told Peggy that he had been hearing voices. As the voices did not tell Randy to do anything bad, Peggy just "left it alone" because Randy did not want to attend counseling. Peggy further testified that Randy's first mental health hospitalization occurred when Randy was in his twenties. At the time of the final termination hearing, Randy was forty-two and had been involuntarily hospitalized as a result of his mental illness on at least three occasions. Randy would not agree to the release of all of his medical records, and the records that the Department did obtain from MHMR went back only to 2012. Randy's last diagnosis through MHMR was that he suffered from paranoid schizophrenia with anti-social personality disorder.

Peggy was familiar with Randy's present situation because Randy has lived with her for the past ten years. Peggy noted that when Randy is not taking his prescribed medications, he will go to his room and talk to himself. Peggy also testified that T.W. and X.W. were a "little nervous" and a "little frightened" when Randy was accusing the children of harming him, but she did not believe that the children were afraid of him. She noted, "They might have been just nervous of the situation. I don't think they was afraid that he was gonna do something to them." Peggy also testified that when Randy takes his medication, he is calmer with the children and not as agitated.

The Department attempted to make a number of appointments with Randy, but he failed to appear. The Department also made appointments for Randy with several

mental health professionals that he also failed to keep, even though the Department was paying for the services and providing transportation. Randy explained that he refused mental health services because he did not believe he needed help. Randy did eventually attend some counseling sessions through MHMR, but he failed to follow through with the recommendations made by MHMR.

Randy sent numerous texts to various individuals, including Department employees, which included threats, flirtatious comments, and pornographic videos. Randy also repeated the accusations against X.W. and T.W. that led to the Department's intervention, and he requested that the Department monitor his phones because he believed someone had taken his money and damaged his computer.

Allen testified that Randy has three misdemeanor convictions for violating protective orders dating back to 2004. Allen further noted that Randy has been convicted of harassment, assault/family violence, and assault/family violence with impeding breath. The last family violence conviction involved a former girlfriend that Randy choked as a result of delusions he had about her. Allen also testified that during the investigation, Randy threatened to light the house on fire while the children were still inside. Both Allen and Peggy testified regarding an additional incident when Randy became physically aggressive with Peggy by kicking or banging on her bedroom door, which frightened Peggy.

Allen testified that the Department feared that the children could be the targets of Randy's aggression because of his delusion that they had harmed him. This belief was bolstered by the family violence conviction that was instigated by Randy's delusions regarding his ex-girlfriend. Allen also noted that Randy threatened to kill Peggy in one of the many text messages he sent to various Department employees.

Allen also testified that both T.W. and X.W. were prescribed psychotropic drugs. She testified that the Department was concerned that the children would not be given their medication appropriately if placed back with Randy because he refused to comply with any medication in regard to his own mental health.

Allen and others testified that granting Randy possessory conservatorship while Peggy or Diana was granted managing conservatorship would not be in the best interest of the children because of the danger that if something happened to the managing conservator, custody would then revert back to Randy.

After considering the testimony and evidence, the trial court entered an order that terminated Randy's rights and named Diana as the managing conservator of X.W. and T.W. The ruling did not exclude Randy from communicating with X.W. and T.W., but left the means and manner of such communications up to Diana.

Viewing all of the evidence in a neutral light in relation to the *Holley* factors, the trial court could have reasonably formed a firm belief or conviction that termination of Randy's parental rights was in the children's best interest. *See In re H.R.M.*, 209 S.W.3d

at 108; *In re C.H.*, 89 S.W.3d at 28; *see also Holley*, 544 S.W.2d at 371-72. Accordingly, the evidence is factually sufficient to establish that terminating Randy's parental rights is in the best interest of T.W. and X.W. We overrule Randy's first issue.

### *Self-Representation*

In his second issue, Randy asserts that the trial court erred in failing to allow him to represent himself during the termination proceeding. While a criminal defendant has the right to waive counsel and represent himself, the same right does not exist in a termination proceeding once counsel has been appointed. *In re A.H.L., III*, 214 S.W.3d 45, 51 (Tex. App.—El Paso 2006, pet. denied). *See also In re H.M.P.*, No. 13-18-00387-CV, 2018 WL 5832099, at *5 (Tex. App.—Corpus Christi Nov. 8, 2018, pet. denied) (mem. op.); *In re R.H.*, No. 01-14-00874-CV, 2015 WL 4594557, at *7 (Tex. App.—Houston [1st Dist.] July 28, 2015, no pet.) (mem. op.).

The United States Constitution does not require appointed counsel in all termination proceedings, but Texas has adopted a statutory scheme that mandates "the appointment of an attorney ad litem for an indigent parent who opposes the termination of the parent-child relationship in a suit filed by a governmental entity." *In re E.A.F*, 424 S.W.3d 742, 747 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (*citing Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 27-32, 101 S.Ct. 2153, 2159-62, 68 L.Ed.2d 640 (1981)); TEX. FAM. CODE ANN. § 107.013. "The plain language of the Code deprives the trial court of the authority to permit the withdrawal of such attorney ad litem absent a finding of good cause. . . ." *E.A.F.*, 242 S.W.3d at 749; TEX. FAM. CODE ANN. § 107.016(3)(C). Additionally,

a parent's waiver of the right to counsel must, at the very least, be knowing and intelligent. *See In re C.L.S.*, 403 S.W.3d 15, 19-20 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *see also In re A.J.*, 559 S.W.3d 713, 717-18 (Tex. App.—Tyler 2018, no pet.).

Randy cites to Rule 7 of the Rules of Civil Procedure in support of his argument that the trial court erred in not allowing him to represent himself. Rule 7 provides "[a]ny party to a suit may appear and prosecute or defend his rights therein, either in person or by an attorney of the court." TEX. R. CIV. P. 7. However, "[t]he right to self-representation provided by Rule 7 is not absolute." *A.H.L.*, 214 S.W.3d at 52. The provisions of the Family Code regarding appointment of counsel override any conflicting rule of procedure. *See Mooti v. Aldirawi*, No. 10-12-00161-CV, 2014 WL 2719916, at *7 (Tex. App.—Waco June 12, 2014, pet. denied) (mem. op.) (*quoting Pena v. Garza*, 61 S.W.3d 529, 531 (Tex. App.—San Antonio 2001, no pet.)) ("The rules of procedure are general rules; statutes are specific. Thus, when the two conflict, the statute trumps the rule.").

Because of Randy's mental health issues and his demeanor during the termination proceeding, the trial court did not err in denying his request to represent himself. Randy first requested leave to represent himself during the first day of the termination hearing, but the trial court was able to persuade Randy to allow his attorney to continue representing him. The trial court summarized his colloquy with Randy:

> All right. So I interpret all of this decision, all this dialogue that I've had with [Randy] as his decision that he's going to relent and let Mr. Thomas represent him, and we'll see what happens here today.

During the second day of the termination hearing, Randy again requested leave to represent himself. The trial court noted during the first day of the termination hearing:

> Listen. Listen to yourself. You cannot stand in silence. You open your mouth and just a torrent of words start coming out that I can't even follow, that don't have anything to do with what we're dealing with at the moment.

Randy's behavior on the second day of the termination hearing was similar to that exhibited on the first day—he attempted to raise collateral matters rather than focusing on the issues central to the termination. Randy exhibited little self-control, talked about the conspiracy against him, and accused the court of bias and prejudice. Randy's behavior and his history of mental illness justified the trial court in determining that Randy's request to represent himself, and thereby waive appointed counsel, was not a knowing and intelligent decision. We overrule Randy's second issue.

### *Conclusion*

Having overruled both issues presented, we affirm the judgment of the trial court.

REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Neill
Affirmed
Opinion delivered and filed May 22, 2019
[CV06]

