

# IN THE
# TENTH COURT OF APPEALS

## No. 10-21-00073-CV

## IN THE INTEREST OF K.H. AND J.W., CHILDREN

**From the 77th District Court
Limestone County, Texas
Trial Court No. CPS-346-A**

## MEMORANDUM OPINION

Julie W.[1] appeals from a judgment that terminated her parental rights to her children, K.H. and J.W. Julie argues that the trial court abused its discretion by admitting impermissible hearsay, that the evidence was factually insufficient for the trial court to have found that she committed the three predicate acts upon which the termination was granted, and that the evidence was factually insufficient for the trial court to have found that she did not establish that her failure to complete her service plan was not due to any fault of her own by a preponderance of the evidence. We affirm the judgment of the trial court.

---

[1] We use an alias to refer to the mother of the children and other adult parties, and the initials of the children to protect the identities of the children. TEX. R. APP. P. 9.8(b)(2).

## HEARSAY

In her first issue, Julie argues that the trial court abused its discretion by admitting testimony by K.H.'s caregiver regarding statements made by K.H. relating to drug use in the home. The statements were admitted pursuant to Family Code Section 104.006 which allows the admission of hearsay statements by child abuse victims in termination of parental rights proceedings. *See* TEX. FAM. CODE ANN. § 104.006.

Family Code Section 104.006 provides that, under certain circumstances, a statement made by a child twelve years of age or younger that describes alleged abuse or neglect against a child is admissible. The statute allows admission of such a statement, providing: (1) the court finds the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability, and (2) the child testifies or is available to testify at the proceeding in the court, or in any manner provided for by law, or the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child. *Id*.

In this proceeding, the Department was asking K.H.'s caregiver about statements made by K.H. prior to her removal regarding why K.H. did not want to return home after spending the Christmas holiday with the caregiver and her family.[2] When the Department asked the caregiver what K.H. had told her, Julie objected on the basis of

---

[2] K.H. and her caregiver were indirectly related by family. K.H.'s cousin had been placed with the same caregiver and K.H. would visit the caregiver's home occasionally prior to her removal by the Department. The Department placed both K.H. and J.W. with the caregiver at the time of the removal from Julie's home.

hearsay. The State responded that the prior answers given by Julie established that the statements would be reliable and admissible pursuant to Section 104.006. Julie responded that "it doesn't meet the 104.16 [sic]." The trial court asked Julie's counsel why it did not meet the requirements of Section 104.006 and Julie's counsel responded that "[y]ou can make a statement about a child as far as abuse and neglect but we're going on about things that are not necessarily abuse and neglect." The trial court sustained Julie's objection "as far as things that would not be abuse and neglect." The trial court then made findings that there were "indications of reliability" and that testifying was not in K.H.'s best interest. Julie did not object to the trial court's findings regarding reliability or K.H.'s failure to testify.

The Department then asked the caregiver about statements K.H. had made regarding her mother's drug use. The caregiver responded that K.H. said that they all had to sleep together on a futon that had needles on it. Further, the caregiver testified:

> [t]hat there was a mirror covering the bathroom where they kept the drugs. And that [K.H.'s] grandmother, (name), kept her drugs rolled up in some sort of rag or something tucked in between the mattress and the frame of the futon and that [K.H.'s] mother kept her pipes and whatever else her drugs and stuff in a box in her bedroom. That [K.H.] has physically seen her mother do drugs—[grandmother] do drugs. And had physically seen [others in the residence] both shooting up with needles in their neck and in their arm and once in their foot.

Julie did not object to this testimony. Next, the Department asked the caregiver if K.H. "ever had to urinate for her mother for her mother [sic] to be able to be able [sic] to pass her urine test?" and the caregiver answered that K.H. had told the investigator

during the forensic interview that "she had to urinate in a cup for her mom and [others in the home]." After the caregiver's answer, Julie objected on the basis that this did not constitute abuse or neglect. The trial court overruled the objection. The caregiver then continued without objection and stated that "[K.H.'s] mother had gotten mad at [K.H.] because she failed one of her drug tests because it had become contaminated and it was one that K.H.'s urine had been used." The Department then asked the caregiver if K.H. had seen anything in the manner of drug distribution and the caregiver responded:

> [K.H.] said that she had been with her mother on several occasions while her mother was selling drugs and that her mom kept all the names and how much people owed them in a black book. And I believe this black book was also taken by the police department there in Limestone County. And that her mom would kind of hold her arm out the window. [K.H.] was very graphic and she showed exactly what she did. That they would actually be in the car—or there would be people coming to the home to get the drugs.

The caregiver was asked where J.W. was at this time and she responded that J.W. was at home or in the car when this took place and that K.H. gave her a list of names. Julie did not object to any of this testimony.

On appeal, Julie argues that the statements were not reliable. However, as shown above, the only complaint Julie raised regarding Section 104.006 was that the statements, which had not been presented to the trial court at that stage, did not constitute statements regarding abuse or neglect. Julie did not raise a complaint regarding the reliability of the statements with the trial court and, therefore, has not preserved that issue for our review. *See* TEX. R. APP. P. 33.1(a) (addressing preservation of error); *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (holding in parental rights termination case that due process argument

that father was raising was not preserved for appellate review because it was not raised in trial court); *In re B.L.D.*, 113 S.W.3d 340, 352-55 (Tex. 2003) (discussing cases in which courts have declined to review unpreserved error when constitutional rights are at stake and holding, under circumstances of that case, "court of appeals must not retreat from our error-preservation standards to review unpreserved charge error in parental rights termination cases").[3]

Julie also argues that the statement that K.H. was forced to urinate in a cup to use for drug tests for Julie and others and that Julie got angry when she failed a drug test using K.H.'s urine did not constitute abuse or neglect and was therefore inadmissible pursuant to Section 104.006. To the degree that Julie complains of the answer about being angry because she failed a test using K.H.'s urine, we find that this complaint was not preserved because Julie did not object to its admission. The question and answer were given after Julie's objection to the prior question regarding providing specimens was overruled, but Julie did not ask for a running objection to this line of questioning. Because Julie did not object to the response to this question, this portion of the issue has been waived. *See* TEX. R. APP. P. 33.1(a).

---

[3] A substantial difficulty arises in our consideration of this issue because neither party offered any evidence or proffer of what statements were made by K.H. that the Department was seeking to admit prior to the trial court's ruling regarding admissibility pursuant to Section 104.006. The trial court did sustain the hearsay objection in part, limiting the statements to those involving abuse or neglect of K.H., whatever they were going to be. However, neither party complains of the trial court's ruling on this issue without knowing what statements by K.H. to the caregiver were to be offered, we do not address the sufficiency of basis of the trial court's findings pursuant to Section 104.006.

Therefore, the only statement remaining for our consideration of this issue is the statement that K.H. was forced to urinate in a cup to be used for Julie and other people's drug tests. Even assuming this statement should not have been admitted, any error in its admission was harmless.[4] To be entitled to reversal due to the erroneous admission of evidence, an appellant must show that the error probably resulted in an improper judgment. TEX. R. APP. P. 44.1(a); *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). In making this determination, we review the entire record. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. The admission of the challenged evidence is harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Id*. Because we find in the next issue that the evidence, even without the statement, including Julie's ongoing drug use before and after the removal of the children and her resultant incarceration, was factually sufficient, we conclude that this is a case in which, even if there were error, "the rest of the evidence was so one-sided that [any] error likely made no difference in the judgment." *Id*. We overrule issue one.

## FACTUAL SUFFICIENCY

In her second issue, Julie argues that the evidence was factually insufficient for the trial court to have found that she "knowingly placed or knowingly allowed the child[ren]

---

[4] From the record the objection clearly appears to be untimely, but the question did not necessarily suggest that the response would not be about conduct that could constitute abuse or neglect which the trial court had determined was admissible. (See Footnote 3) Thus, rather than hold that the objection was waived because it may have been untimely, we will address the harm, if any, that may have resulted from the allegedly erroneous admission of the statement.

to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]" pursuant to Section 161.001(b)(1)(D) or "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]" pursuant to Section 161.001(b)(1)(E) of the Family Code. *See* TEX. FAM. CODE §161.001(b)(1)(D) & (E). In her third issue, Julie complains that the evidence was factually insufficient for the trial court to have found that she "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child[ren]" pursuant to Section 161.001(b)(1)(O). *See* TEX. FAM. CODE §161.001(b)(1)(O).

**STANDARD OF REVIEW**

In a factual-sufficiency review in a termination case, we must weigh disputed evidence contrary to a finding against all the evidence in its favor. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We consider whether the disputed evidence is such that a reasonable factfinder could not have resolved it in the finding's favor. *Id*. The evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in a finding's favor is so significant that the factfinder could not have formed a firm belief or conviction that the finding is true. *Id*.

In reviewing for factual sufficiency, however, we must be careful not to usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). The factfinder is the sole arbiter of witness credibility. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts,

and evaluates the demeanor and credibility of witnesses. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). Because the trial judge saw the witnesses firsthand, we must give him or her due deference, notwithstanding the heightened factual-sufficiency standard. *In re J.S.*, 584 S.W.3d 622, 634 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

Because we are required to consider the sufficiency of the evidence pursuant to Sections 161.001(b)(1)(D) or (E) if challenged, we will address one of those grounds first. *In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019). If the evidence is sufficient as to that ground, it will not be necessary to address the other predicate grounds because sufficient evidence as to only one ground in addition to the best interest finding is necessary to affirm a termination judgment.[5] *Id.* at 232-33.

## SECTION 161.001(B)(1)(E)

Julie argues that the evidence was factually insufficient for the trial court to have found that she committed the predicate act set forth in Section 161.001(b)(1)(E) of the Family Code. Section 161.001(b)(1)(E) allows termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE § 161.001(b)(1)(E). "Endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional

---

[5] Julie has not challenged the sufficiency of the evidence relating to the best interest finding in this appeal.

or mental health." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). An endangerment finding often involves physical endangerment, but it is not necessary to show that the parent's conduct was directed at the children or that the children suffered actual injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Rather, the specific danger to the children's well-being may be inferred from the parent's misconduct alone." *Id*. In our endangerment analysis pursuant to Section 161.001(b)(1)(E), we may consider conduct both before and after the Department removed the children from their parent. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). In general, a parent's conduct that subjects children to a life of uncertainty and instability endangers the physical and emotional well-being of those children. *Boyd*, 727 S.W.2d at 531.

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d at 345. A parent's drug use exposes the children to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the children. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A parent's continued drug use when the custody of her children is in jeopardy supports a finding of endangerment. *See In re S.R.*, 452 S.W.3d at 361-62. The factfinder may give "great weight" to the "significant factor" of drug-related conduct. *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Further, a parent's criminal conduct, convictions, or imprisonment are relevant to the question of whether she engaged in an endangering course of conduct. *In re S.R.*, 452 S.W.3d at 360-61. Routinely subjecting children to the probability that the children will be left alone because a parent is in jail endangers the children's physical and emotional well-being. *See In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.).

**FACTS**

The Department received two referrals regarding drug use and distribution in the trailer where K.H. and J.W. lived with Julie, their maternal grandmother, and their maternal uncle. The children, ages 12 and 8 at the time of the removal, were asked about the allegations regarding drug use and the condition of the home. K.H. told the investigator that she believed all of the allegations regarding drug use were true. In her forensic interview at a child advocacy center approximately three days after the removal, K.H. reported that "there were needles all over the home" and that "her mother buys and sells drugs." J.W. told the investigator that he did not believe all of the allegations but that his maternal uncle had used drugs and needles.

At the time of the removal, J.W. tested positive for methamphetamine and suffered from withdrawals for approximately two to three weeks, after which he was angry and depressed. He was later diagnosed with attention deficit disorder and severe bipolar disorder in a psychological evaluation. The evaluator attributed the bipolar disorder to years of exposure to methamphetamine, and J.W. was eventually placed in a residential treatment center due to his issues where he remained at the time of the trial.

Julie admitted to using drugs off and on for many years and had relationships with individuals who used and sold drugs. She also acknowledged that her relatives that had lived with her and the children through the years were drug users as well. The first was when K.H. was five months old and her paramour who was living with them was arrested for and convicted of possession of methamphetamine. Two years later, the same paramour who was still living with them was arrested for possession with the intent to deliver and tampering with evidence and was subsequently sentenced to imprisonment. After J.W.'s birth, Julie was in a relationship with another man, and they were living in the trailer with her mother and the children. In 2017, Julie and the man were arrested after methamphetamine was found in the trailer pursuant to a search warrant. In 2018, Julie was charged with first degree possession of methamphetamine with the intent to deliver and was ultimately placed on deferred adjudication community supervision for ten years. Julie had continued using methamphetamine after her arrest and tested positive on the day she was sentenced. The man was sentenced to ten years in prison.

Julie submitted to drug testing by hair and urine two days after the removal of the children, and both tests were positive for amphetamine and methamphetamine, and the hair sample was positive for marijuana. Julie admitted that she knew that she had tested positive and that it was a violation of her community supervision which could ultimately result in her imprisonment.

Julie admitted that Gene, one of her brothers, lived off and on in her mother's trailer with all of them and that he was a methamphetamine user. Julie also admitted that

Carl, another brother, lived in and out of the home at times and had been incarcerated for drugs. She admitted that she and Gene were using methamphetamine but initially denied that she had ever used it in her home. Julie later acknowledged that she used drugs in her bedroom but denied that the children were home. She denied that needles and pipes were around the home. When asked if she had sold drugs, Julie answered, "No, not really, I mean, didn't sell them (inaudible)—I wasn't making nothing."

Julie stated that she was unaware that J.W. was positive for methamphetamine until she was told by the Department, and that she never saw him use methamphetamine and did not believe that he had. She denied that J.W. had touched drug paraphernalia or used methamphetamine because they did not use it in the home. Julie testified that she believed that J.W. tested positive due to skin contact with other relatives.

After the removal of the children, Julie tested positive in an analysis of her hair for methamphetamine and amphetamine four times, and the levels of methamphetamine quadrupled and the amount of amphetamine tripled in the results of those tests during the proceedings. Julie testified that she continued using drugs "off and on" during this time even though it could result in her imprisonment for 5 to 99 years or life and the loss of her parental rights. She was arrested approximately four months prior to the final hearing for violations of her community supervision. Her violations included an arrest in March after the children's January removal and failed drug tests. Julie's sentence was modified to require her to complete the Substance Abuse Felony Punishment (SAFP) program, and she was due to complete the program approximately four months after the

final trial but would have to go to a halfway house for two months after her release from SAFP.

K.H. told her caregiver that she had seen extensive drug use and distribution in the home and with her mother as more specifically described in the first issue above. Julie argues that we cannot consider those statements because they were inadmissible. However, with the exception of the one statement, we did not find K.H.'s statements were inadmissible and therefore, we consider all of them except for the statement regarding providing urine samples in our factual sufficiency analysis. K.H. told the caregiver that she was present and had observed her mother selling drugs, her mother and relatives and paramours using drugs, how the drugs were stored in the house, and that she and J.W. slept on a futon with needles on it.

Julie testified and argues on appeal that K.H. made up her allegations because she wanted to live with the caregiver, who also had custody of K.H.'s cousin, which renders her statements unreliable. Julie continually denied that K.H. and J.W. were exposed to drugs in the home.

There was also testimony that the trailer was very dirty and that Julie's mother was a hoarder. The Department was never allowed into the home, and the caregiver had not gone beyond the doorway on her visits but observed that there were trash wrappers and junk "everywhere," boxes stacked up, and holes in the wall that looked like someone had punched it, and a smell of chemicals and burning electrical wire that was so strong it burned her nose. The caregiver had visited the home three or four times in the two

months prior to the removal of the children. The caregiver also had observed Julie's mother and two other men coming out of a shed with one of them carrying a methamphetamine pipe on two separate occasions, although Julie denied that they were using drugs in the shed because it was full of junk and there was no room to use drugs in there.

Additionally, when K.H. visited the caregiver prior to the removal, she seemed undernourished and underweight and had poor hygiene. After the removal, it was discovered that K.H. had several medical and dental issues that had not been addressed, including a hernia which required surgery, legs that are bowed-in which an orthopedic specialist determined might be too late to correct due to the growth of K.H.'s bone plates, a hole in her heart which requires the care of a cardiologist, and impacted teeth which need to be surgically removed. Additionally, K.H. required counseling for her emotional issues but was doing better over time.

Julie argues that the evidence was factually insufficient because she denied that the children had been exposed to drug use or that her drug use impacted the children. Further, she correctly argues that drug use alone is insufficient to support a finding of an endangering course of conduct. *See In re L.C.L.*, 599 S.W.3d 79, 86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc) (A parent's drug use alone, without proof of any causal connection to endangering their children's welfare, is not enough to justify terminating a parent-child relationship.). However, in *L.C.L.*, the court noted the absence of evidence of criminal charges related to the parent's drug use or "proof of threat of

incarceration due to alleged drug use." *Id.* at 84-85. That is not the situation we have in this proceeding as Julie has been convicted and incarcerated for her drug use and distribution. Julie argues that in light of her "clear and direct refutations" regarding the exposure of the children to drugs in the home the disputed evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" to support a finding pursuant to Section 161.001(b)(1)(E). We disagree.

The trial court was free to believe or disbelieve the testimony of Julie, a long-time drug user whose testimony was at times inconsistent with other testimony, and to believe the testimony of the Department and the caregiver, including the statements made by K.H., taken with the testimony that J.W. tested positive for methamphetamine at the time of his removal and was believed to have suffered from the long-term exposure to methamphetamine support the finding that Julie "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE § 161.001(b)(1)(E). We overrule issue two as to Section 161.001(b)(1)(E). Because we have found that the evidence was factually sufficient as to one predicate ground upon which the termination was based, we do not need to reach the second part of Julie's second issue or issue three. Further, because we did not address the sufficiency of the evidence relating to the failure to complete Julie's service plan in issue three, we do not reach issue four which relates to the reasons for the failure to complete the service plan.

## CONCLUSION

We affirm the judgment of the trial court.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
        Justice Johnson, and
        Justice Wright[6]
Affirmed
Opinion delivered and filed September 8, 2021
[CV06]



---

[6] The Honorable Jim R. Wright, Senior Chief Justice (Retired) of the Eleventh Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE §§ 74.003, 75.002, 75.003.