

## NUMBER 13-24-00136-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

### IN THE INTEREST OF J.F. AND J.F., CHILDREN

### ON APPEAL FROM THE 430TH DISTRICT COURT
### OF HIDALGO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Silva**
**Memorandum Opinion by Justice Longoria**

Appellant J.L.F. (Father) appeals a judgment terminating his parental rights to his children, twins J.F. and J.F. (Jack and Joe).[1] In four issues, which we reorganize as one, Father argues that the evidence was legally and factually insufficient to support the statutory termination grounds and that termination was not in the childen's best interest.[2]

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, parents, children, and other family members are referred to by their initials or an alias. *See* TEX. FAM. CODE ANN. § 109.002(d).

[2] The parental rights of A.R., mother of the children, were also terminated. However, she is not a

We affirm.

## I.  BACKGROUND

### A.  Pretrial Proceedings

Father and A.R. (Mother) have two children together, Jack and Joe. According to the affidavit in support of emergency removal, on February 20, 2022, appellee, Texas Department of Family and Protective Services (the Department), received a report alleging neglectful supervision of the children after they tested positive for cocaine at birth. The report also indicated that Mother admitted to using cocaine during her pregnancy. Vivian Garza, a Child Protective Services (CPS) specialist, and Gerardo Cavazos, a CPS investigator, met with Mother and the children's maternal grandmother on April 7, 2022. Mother indicated that she was the victim of domestic violence by Father, who was incarcerated at the time. Mother, who was thirty-nine years old at the time, admitted that she had been using cocaine since she was eighteen and "would use twice a day every day and has been doing it ever since." Mother also stated that she last used cocaine when the children were born. Garza discussed a safety plan with Mother and maternal grandmother and advised that Mother could not be alone with the children at any point due to her testing positive for cocaine. Garza also explained to Mother that the Department recommended that she participate in services to "address the dynamics of domestic violence, parenting skills, protective measures, and substance abuse sessions." Mother agreed to participate in individual counseling and implement changes to ensure child safety.

---

party to this appeal.

According to the affidavit, the Department sought removal of the children due to Mother's continuing use of cocaine and having the children alone under her care. It also noted that Mother's family members were unable to help Mother and the children due to Mother's pattern of leaving the children with them while she used drugs. Mother was also unable to identify suitable caregivers or potential caregivers to monitor her while she was with the children. The affidavit also noted that Mother referred to Father as the "alleged father" of Jack and Joe and that she had indicated she was the victim of domestic violence by Father. The affidavit included an extensive list of Father's criminal history, including both arrests and convictions.

The Department sought removal and temporary managing conservatorship of Jack and Joe alleging "a continuing danger to the physical health or safety of the children," which was granted by an associate judge on May 24, 2022.[3] *See* TEX. FAM. CODE ANN. § 201.005 (authorizing a judge of a court to refer a suit under Title 5 of the family code, including § 262.001, to an associate judge). Subsequently, the associate judge issued temporary orders regarding visitation and a family plan of service for Mother.

On July 26, 2022, the associate judge signed an order requiring Father to submit to genetic testing to determine his parentage to Jack and Joe. On October 28, 2022, DNA test results were submitted to the associate judge. On December 20, 2022, the associate judge signed its adjudication of parentage and found that Father was the biological father of Jack and Joe. On February 13, 2023, the associate judge signed its order imposing services for Father.

---

[3] The Department's original petition seeking removal of the children pursuant to TEX. FAM. CODE ANN. § 262.001 was filed on the same day.

3

**B.     Trial Record**

On May 3, 2023, the associate judge presided over a bench trial for the Department's petition for termination of Father's parental rights.[4]

Garza testified that Jack and Joe were born on February 20, 2022, and that she worked with Mother after the children were removed. Mother informed Garza that Father was the biological father of the children, but Mother did not offer Father as a placement for the children because he was incarcerated. Garza sent Father a letter at the jail informing him about the case being opened and the children having been removed. Father sent a reply letter, which was forwarded to Cassandra Ovalle, a conservatorship caseworker with the Department. Ovalle testified that she was assigned to Mother's case from May 23, 2022, through June 27, 2022. Mother had explained to Ovalle that she and Father had incidents of domestic violence or physical altercations in their relationship. Ovalle later located Father and found that he was incarcerated in Huntsville, Texas. According to Garza, Father was not part of the initial report when CPS got involved and that he was, at that time, a "non-offending parent."

Erica Perez, a caseworker for the Department, testified that she took over for Ovalle in June 2022 and that the Department's goal changed from family reunification to unrelated adoption on September 7, 2022. Perez stated this goal changed, as it related to Father, because "[he was] in state jail and he was not expected to be released until [October] 2024, and he had just been denied parole." According to Perez, Mother

---

[4] The bench trial also concerned the Department's petition for termination of Mother's parental rights, which is not at issue in this appeal. We limit our recitation of the testimony elicited at trial to that which is necessary to resolve the issues presented on appeal. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

4

indicated that she was with Father while she was pregnant and that there was domestic violence between them, which resulted in his incarceration. Perez stated that the Department considered placing the children with T.F., Father's sister. A home study was attempted but T.F. withdrew herself from consideration. The Department conducted a home study of Mother's sister, P.C., which was favorable, and the children were placed with P.C. on October 6, 2022. At the time of trial, the children had been residing with P.C. for seven months.

Perez also testified that she sent letters to Father in prison that addressed his family plan and services. Though he had not been established as the biological father of the children at the time Perez worked with Father, Perez explained that the Department recommended "a psychological, [a] psychosocial, individual counseling, substance abuse assessment, necessary treatment" as well as random drug testing and paternity testing. Perez noted that she referred Father to Windham Independent School District (WISD) because they offered services to inmates in the Texas jail system that included "substance abuse, changing lifestyles, making better choices, not reoffending, [and] parenting." However, Father was classified as a "G5" inmate,[5] and therefore did not meet the criteria to participate in services offered by WISD. Perez noted that Father's inability to participate in services with WISD would be reconsidered if his behavior improved and he "went down to a G4." Perez stated that, although Father was not an offending parent at the time of the children's removal, he was not available to take in the children due to

---

[5] Father testified that a "G5" was the level designated for the most violent offenders within the prison, and because he was designated at that level, he was confined to his cell most of the day and permitted to be out of his cell for two hours per day.

5

his incarceration. Perez noted that Father has a lengthy criminal history and that Mother had concerns over Father's access to the children because he was violent and she did not feel they would be safe with him.

Christina Vaughn testified that she was assigned as the Department's courtesy worker for Father and that she visited him monthly from October 2022 to January 2023 while he was incarcerated at the Estelle Unit in Huntsville. Vaughn stated that no services ordered by the trial court were available to Father because he was in the "high-security wing [within the prison]" due to his involvement in an altercation with another inmate. According to Vaughn, the Estelle Unit did not make available services for inmates in the high-security wing.

Vaughn also testified regarding statements Father made during Vaughn's last visit in January 2023. Vaughn stated that Father was unhappy when she informed him that the Department's concurrent goals were that the caregivers of the children be appointed as permanent managing conservators and related adoption. According to Vaughn, Father asked her "what if he had went over there to the caregiver[']s home and shot her." Vaughn replied that she would not have that conversation, and Father then stated, "[I]t's not something that I would do but that is something that CPS makes parents think about." Father also told Vaughn not to visit him if the Department chose to terminate his rights and requested a caseworker to mail him a letter informing him of the outcome of the case. Vaughn stopped visiting Father by his own request after that visit.

Ariel Espitia, a conservatorship caseworker with the Department, was assigned to Father's case in mid-October 2022 and took over for Perez. Espitia kept in contact with Father by sending him letters monthly and having Vaughn visit him in jail monthly. Espitia

testified that she informed Father by letter in March 2023 regarding the court-ordered services he was required to engage in. This letter was admitted into evidence. In the letter, Espitia stated that, "The Department referred you for services with [WISD] back in August 2022. [WISD] is not able to offer you services due to your current custody level of a G5. In order for you to be eligible your level must be lowered to a G4." According to Espitia, Father was ordered to complete "a psychological [assessment], a substance abuse assessment with necessary treatment, parenting [classes], individual counseling, anger management, and [Battery Intervention Prevention Program]."[6] Though Father received a certificate for completing the Voyagers program while incarcerated, Espitia noted that Voyagers did not directly address any of the services ordered by the court and was not particularly tailored to the children or the relationship with the children's caregivers.

Espitia further testified that Father's conviction for "assault on a family member [by] imped[ing] airway and circulation" was the reason he was incarcerated in the Estelle Unit. Mother was the victim of that offense, and she had been six months pregnant with the children at the time. The judgment of this offense was admitted into evidence and indicates that Father pleaded guilty to the offense on January 19, 2022, that the offense constituted a third-degree felony, and that Father was sentenced to three years' imprisonment. Espitia also stated that Father had previously committed four other assaults, including two "bodily injury charges." According to Espitia, Father was classified as a level G5 inmate at the Estelle Unit in September 2022 because he had assaulted a corrections officer, and he could not lower his level because he had subsequent fights

---

[6] The associate judge imposed services on Father via written order signed on February 13, 2023.

while classified as a G5.

Espitia testified that Father sent her letters, seven in total, from October 2022 to April 2023. According to Espitia, though Father inquired about his children and asked for pictures in these letters, he never communicated any plans for his children's future, how he planned to raise them, where he planned to reside upon release from jail, or where he would work. However, Father expressed that he wanted to see his children after he was released from prison and did not want to relinquish his parental rights. Regarding the possibility of Father visiting his children, Espitia stated that P.C. expressed concern about the well-being of herself, her husband, and the children because she was aware of Father's violent history and "heard from [Mother] what has happened." Espitia noted that the trial court had granted a non-disclosure order which prohibited the disclosure of the address and contact information of P.C. and her husband to Father. Espitia also stated that T.F. had withdrawn from the home study because she was afraid of what Father would do if he got out of jail and she had the children in her care. Espitia recommended to P.C. and her husband that they adopt the children. Espitia opined that it was in the best interest of the children to have no contact with Father because of his extensive criminal history and the reason for his incarceration.

Father testified that he was last in a relationship with Mother on September 13, 2021. Father stated that Mother lived with him in McAllen at that time, that she was unemployed, and that he provided her food, clothing, and money. Father stated that they lived at his brother's trailer, and that twelve people lived there. Father also stated that he had been unemployed but mowed lawns and washed cars. According to Father, Mother was ten weeks pregnant when he learned about the pregnancy. Regarding his assault of

8

Mother, Father stated that the assault occurred at a friend's house and Mother had just bonded him out from an evading arrest charge just prior to the incident. Father stated that Mother went to the restroom, took out a "little baggy" from her bra, and told him it was cocaine. Father then told Mother it was not cocaine "because it was brown [in] color," that Mother did not want to give the substance to him, that he took the substance from her, and that the substance was "China white heroin." Father then stated he "blanked out" and strangled Mother because she was "feeding [his] kids heroin and [he] didn't want them to become heroin babies." Father also admitted that Mother had bruising on her neck and that she had been four months pregnant at the time. The following exchange occurred:

| [The Department]: | So, at th[e] time[ of the assault], you didn't care that she was carrying your children, right? |
| [Father]: | Yes, I did. That's why—why she has those marks because I took away the heroin in her hand. That's why we had all the scratches on our faces. She broke her phone on my face. |

. . . .

| [The Department]: | Would you be surprised to learn that law enforcement didn't collect any heroin evidence? |
| [Father]: | I had threw it away. |
| [The Department]: | Okay, and you didn't make those allegations against her at that time—or her having possession of heroin? |
| [Father]: | No, ma'am. |
| [The Department]: | And you were the only one arrested that night, correct? |
| [Father]: | Yes, ma'am. I turned myself in, matter of fact. |
| [The Department]: | Do you know that . . . if you hadn't stopped |

9

|                | choking her you could have lost your children that day? |
|----------------|---------------------------------------------------------|
| [Father]:      | Ma'am, I didn't choke her out like that. I put pressure but I didn't choke her to the point where she would pass out, none of that. I put pressure to hold her back. |

Father testified that he knew that Mother had a drug problem while they were dating and that the two used drugs together. Father stated that he did not use the drugs that Mother used, that her drug of choice was crack cocaine, and that he smoked marijuana during her pregnancy. Father also stated that he did not provide Mother with drugs, but she purchased drugs with the money he gave her, and that this "was before [he] knew she was pregnant." Father admitted to never trying to get Mother treatment for her drug abuse because it would "just cause problems" and that she would hit him every time he tried to stop her. According to Father, Mother would resort to prostitution if he did not give her money for drugs.

Father stated that he did not qualify for services through WISD because he had been classified as a G5, the level for the most violent of offenders, at the beginning of serving his sentence. Father also stated that he had not had any phone calls or video chats with the children because he was a G5. According to Father, he had to abstain from altercations during his incarceration in order for his status to be lowered, that he had to "[serve] a year before anything happens to even get my G2 back or G4," that he had been incarcerated for a year and a half, and that his discharge date was October 2024. Father admitted to being in and out of prison for most of the last eleven years and that he would typically end up back in prison after being out a year or two. Father stated that a lot of his previous crimes were crimes of violence and that he had "quite a few" prior felony

10

convictions. Father admitted to having convictions for assault of a public servant in 2015, aggravated assault with a deadly weapon in 2012, possession of a controlled substance in a school zone in 2010, possession of marijuana "5 pounds, maximum," and robbery. Father also admitted to violating protective orders established for C.G., the mother of his daughter, and being arrested for assault causing bodily injury to a family member in 2015. Father also admitted to committing thefts when out of jail.

Father denied that he stated he would shoot the children's caregivers if he learned of their residence or indicated a plan to take the children from their caregivers when he was released from prison. Father admitted that he stated that "CPS makes people . . . think . . . to hurt somebody for taking away their rights, taking away their kids," and that "it makes [him] angry."

Father also testified that after he got into a fight at "Garza West," he voluntarily participated in Voyagers, a six week "class where you learn character, forgiveness, parenting, drug addiction." He stated he did the course "[t]o learn about [him]self, to try to become a better person, to try to just stay out of prison." Father also stated that he knew that he needed to do something better with his life because he wanted to be with his children. Father's Voyagers certificate of completion was admitted into evidence.

Father stated that after he was released from prison, he planned to live in Corpus Christi with his grandparents and work in restaurants or construction. Father also stated he plans for the children to live with him when he gets a house or apartment. Father agreed that the children should stay with P.C. in the interim but asked that his parental rights not be terminated. Father stated that he would not be violent with the children and that he has patience.

11

The children's guardian ad litem recommended that it was in the children's best interest for Father's parental rights to be terminated and that the children be put up for adoption, preferably to people that did not know Father so as to avoid problems for the adoptive parents.[7] When making this determination, the guardian ad litem stated that Father "has a very violent nature about him," that he did not seem to be improving, and that he was still having problems with violence in prison.

At the conclusion of the evidence, the Department moved for termination of Father's parental rights. The associate judge granted the Department's request and terminated Father's parental rights.

## C.     Termination Orders

On May 16, 2023, the associate judge signed his written order terminating Father's parental rights to Jack and Joe. Father filed a timely request for a de novo hearing before the referring trial court. *See* TEX. FAM. CODE ANN. § 201.015. Upon conducting its de novo hearing on January 23, 2024, the trial court informed the parties that he had reviewed all the hearings conducted by the associate judge, that it agreed with the associate judge's decision, and that it had found by clear and convincing evidence that Father's parental rights should be terminated.[8]

On January 25, 2024, the trial court signed its written "Order of Termination After De Novo [Hearing] as to [Father]," which terminated the parent-child relationship between Father and the children.[9] The trial court found three grounds for termination, including

---

[7] The children's guardian ad litem opined that Father was going to find out where P.C. lived when he gets out of prison and cause problems.

[8] The parties did not present further witnesses.

[9] The order also terminated Mother's parental rights and appointed the Department as permanent

that Father:

[(1)] engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren], pursuant to § 161.001(b)(1)(E), Texas Family Code;

[(2)] constructively abandoned the child[ren] who ha[d] been in the permanent or temporary managing conservatorship of the Department . . . for not less than six months and . . . the Department has made reasonable efforts to return the child[ren] to [Father,] [Father] has not regularly visited or maintained significant contact with the child[ren,] and [Father] has demonstrated an inability to provide the child[ren] with a safe environment, pursuant to § 161.001(b)(1)(N), Texas Family Code; [and]

[(3)] knowingly engaged in criminal conduct that has resulted in [Father's] conviction of an offense and confinement or imprisonment and inability to care for the child[ren] for not less than two years from the date of filing the petition," pursuant to § 161.001(b)(1)(Q), Texas Family Code.

The trial court further found that termination of Father's parental rights was in the children's best interest. *See id.* § 161.001(b)(2). This appeal followed.

## II. STATUTORY GROUNDS & BEST INTEREST

In his sole issue, Father contends that the evidence was legally and factually insufficient to support each termination ground and the trial court's best-interest finding.

## A. Standard of Review & Applicable Law

"Because the natural right between a parent and his child is one of constitutional dimensions, *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985), termination proceedings must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). Due process requires that parental termination be supported by clear and convincing evidence. *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014); *In re K.M.L.*, 443 S.W.3d at 112. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of

managing conservator of the children.

13

the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). To terminate parental rights, a court must find one of the grounds for termination specified in § 161.001(b)(1) of the family code and that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2).

In our legal sufficiency analysis, we must view the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *In re J.F.C.*, 96 S.W.3d at 266). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact[ ]finder could reasonably form a firm conviction or belief that the parent violated a provision of [§] 161.001[(b)](1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). Under this standard, we consider whether the "disputed evidence is such that a reasonable factfinder

14

could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266. If we conclude that "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232–33 (Tex. 2019) (per curiam). However, regardless of whether other grounds for termination are unchallenged on appeal, an appellate court must always review issues alleging the evidence was insufficient to support findings of endangerment under grounds (D) or (E). *See id.* at 234, 237 (holding that "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights" on endangerment grounds because an endangerment finding "becomes a basis to terminate that parent's rights to other children" under § 161.001(b)(1)(M)); *see also In re A.A.Z.*, Nos. 13-21-00160-CV & 13-21-00161-CV, 2021 WL 5225440, at *5 n.7 (Tex. App.—Corpus Christi–Edinburg Nov. 10, 2021, pet. denied) (mem. op.).

**B.    Discussion**

**1.    Termination under Subsection (E)**

Father argues that his incarceration alone cannot be the basis for termination under subsection (E), and that his assault on Mother could not support termination under subsection (E) because the children did not exist, and he did not know that Mother was

15

pregnant at the time of the offense.

Section 161.001(b)(1)(E) allows termination if the parent has engaged in conduct or knowingly placed the child with persons who engage in conduct which endangers the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Subsection (E) requires evidence of a "voluntary, deliberate, and conscious course of conduct by the parent" and generally more than a single act or omission. *In re D.L.W.W.*, 617 S.W.3d 64, 78 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). "Endangering conduct under subsection (E) need not 'be directed at the child'" *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Nor must the child 'actually suffer[ ] injury.'" *Id.* (citing *Boyd*, 727 S.W.2d at 533). "Rather, 'endanger' means to expose to loss or injury; to jeopardize." *Id.* (citing *Boyd*, 727 S.W.2d at 533). In addition, "endangering conduct may include the parent's actions before the child's birth." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

Regarding imprisonment, the Texas Supreme Court has stated:

In . . . *Boyd*, we acknowledged that "Texas cases have considered the involuntary termination of the rights of an imprisoned parent, and have held that mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child," but we nevertheless held that incarceration does support an endangerment finding "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child."

*In re J.F.-G.*, 627 S.W.3d at 312–13 (quoting *Boyd*, 727 S.W.2d at 533–34). "A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can

support a finding of endangerment." *Id.* at 313. (citing *In re J.O.A.*, 283 S.W.3d at 345–46). "Imprisonment thus 'is certainly a factor' the trial court may weigh when considering endangerment." *Id.* (quoting *Boyd*, 727 S.W.2d at 533). In addition, a parent's use of narcotics and its effect on their ability to parent may also qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d at 345.

An offense committed by a parent before the birth of the parent's child "can be a relevant factor in establishing an endangering course of conduct." *In re E.N.C.*, 384 S.W.3d 796, 804–05 (Tex. 2012). Here, the evidence established that Father pleaded guilty to strangling Mother when she was four months' pregnant with the children. "Domestic violence may be considered evidence of endangerment." *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct."). In addition, contrary to his suggestion on appeal, Father testified that he knew Mother was pregnant at the time of the assault.[10] "A child is endangered when the parent's course of conduct creates a potential for danger about which the parent is aware but disregards." *In re E.J.M.*, 673 S.W.3d 310, 329 (Tex. App.—San Antonio 2023, no pet.) (en banc) (citing *In re I.I.T.*, 648 S.W.3d 467, 475 (Tex. App.—San Antonio 2021, no pet.)). Father's actions in choking Mother risked the health of both Mother and the unborn children. *See id.* Regarding this offense, Father was sentenced to three years' imprisonment, which the

---

[10] To the extent that Father argues that he did not know Mother was pregnant at the time of the assault, which we find is not supported by the record, we note that knowledge of paternity is not a prerequisite to a showing of a parental course of conduct which endangers a child under Subsection (E). *See A.S. v. Tex. Dept. of Family & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.—El Paso, 2012 no pet.).

17

trial court could have considered in determining endangerment. *See In re J.F.-G.*, 627 S.W.3d at 313.

Father also stated that he knew that Mother had a drug problem, and that he and Mother used drugs together. *See In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."). According to Father, Mother's drug of choice was crack cocaine and, although he did not procure drugs for her, he knew that she would buy drugs with money he had given her. Father seemed to suggest that this pattern of behavior occurred before he knew Mother was pregnant [11] but admitted he had never sought to get Mother treatment because it would "just cause problems," that Mother would hit him if he tried to stop her or would resort to prostitution if he did not give her money for drugs. "Endangerment can include knowledge that a child's mother abused drugs while pregnant, the father knew, and the father did not try to stop her."[12] *See In re E.J.M.*, 673 S.W.3d at 330 (cleaned up); *see also In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) (concluding trial court could have formed a firm belief or conviction that father endangered R.S.-T.'s physical or emotional well-being because record showed mother used drugs during her pregnancy and father was aware of her drug use; both parents acknowledged the domestic violence; when questioned by the Department, father made light of the domestic abuse, explaining things simply "got out of hand"). In 2022, the

---

[11] Father did not explicitly testify that he and Mother stopped using drugs together once he learned she was pregnant, or that he stopped giving Mother money in an effort to prevent her from purchasing drugs. The trial court, as factfinder, was free to disbelieve the inference suggested by Father's testimony.

[12] Father testified that he choked Mother in an effort to stop her from using heroin. However, Father also stated that he threw away the heroin and did not make those allegations at the time he was arrested. Without any further proof, the trial court, as factfinder, was free to disbelieve this testimony.

18

Texas Supreme Court agreed with this proposition because "holding otherwise would effectively endorse a parent's willful ignorance of the significant risk that a pregnant mother's drug use poses," which it declined to do. *In re J.W.*, 645 S.W.3d 726, 750 (Tex. 2022). However, the *J.W.* Court did not "endorse attributing any and all known dangers posed to a child during the mother's pregnancy to the other parent." *Id.* "As is often the case in parental-termination proceedings, the inquiry is necessarily dependent on the facts and circumstances." *Id.* Here, other facts and circumstances also support the trial court's endangerment finding.

In addition to his assault of Mother, Father was previously convicted of numerous serious crimes, including aggravated assault with a deadly weapon, possession of controlled substances (including marijuana), and robbery. *See In re J.F.-G.*, 627 S.W.3d at 313. Father admitted to violating a protective order established for the mother of his daughter, committing thefts, and being arrested for assault of a family member. Father also admitted that he had been in and out of prison for most of the last eleven years and that many of his previous convictions were for crimes of violence. Father's criminal record shows a pattern of escalating conduct, not an isolated incident. *See id.* Thus, the trial court could have fairly considered Father's criminal history and determined that it supported a finding of endangerment. *See id.* Furthermore, the evidence also established that Father's violent conduct continued after he was incarcerated for strangling Mother. Father was classified as level G5 within the Estelle Unit for his involvement in assaults while in prison. The trial court could have properly considered Father's persistent violent conduct in prison when assessing endangerment. *See In re J.F.-G.*, 627 S.W.3d at 313.

Viewing the evidence in the light most favorable to the trial court's judgment, we

conclude a reasonable trier of fact could have formed a firm belief or conviction that Father "engaged in conduct . . . which endanger[ed] the physical or emotional well-being of the child[ren]." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Thus, the evidence is legally sufficient to support this finding. *See In re J.P.B.*, 180 S.W.3d at 573. Further, after considering the record, including any disputed or contrary evidence, we conclude the evidence is factually sufficient to support the trial court's termination under subsection (E). *See In re M.C.T.*, 250 S.W.3d at 168. Because the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need not address the sufficiency of the evidence supporting the remaining grounds for termination. *See In re N.G.*, 577 S.W.3d at 232–33. We overrule Father's issue as it relates to the statutory grounds for termination.

### 2. Best Interest

Father also argues that the evidence was insufficient to support the trial court's finding that termination was in the children's best interest.

When considering the best interest of the child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "[T]he best interest standard does not permit termination [of parental rights] merely because a child might be better off living elsewhere." *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (citation omitted). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). The Texas Legislature has provided several factors for courts to consider regarding a parent's willingness and ability to provide a child with a safe

environment,[13] and the Texas Supreme Court has provided a similar list of factors to determine a child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The non-exclusive *Holley* factors include: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals

---

[13] The statutory factors include:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills . . . ; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE ANN. § 263.307(b).

21

seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley*, 544 S.W.2d at 371–72.

"A best-interest finding does not require proof of any particular factors," and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re E.J.M.*, 673 S.W.3d at 332 (cleaned up). "A trier of fact may measure a parent's future conduct by his past conduct [in] determin[ing] whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "In analyzing these factors, the court must focus on the best interest of the child, not the best interest of the parent." *In re E.J.M.*, 673 S.W.3d at 332 (cleaned up).

Regarding the first *Holley* factor, the children are too young to express their desires. *See Holley*, 544 S.W.2d at 371–72. When children are too young to express their desires, the factfinder may consider whether the children have bonded with their caregivers, is well-cared for by them, and whether the child has spent minimal time with a parent. *See In re S.J.R.-Z*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied). At the time of trial, the children were about fourteen months old and had been placed with their caregivers for seven months. It is undisputed that the children were well cared for by their caregivers, and Father testified that he agreed that they should stay with them. The evidence also demonstrated that Father had not spent any time with the

22

children since their birth due to his incarceration, indicating that the children were not bonded to Father. In light of this testimony, this factor weighs in favor of the trial court's best interest finding.

Evidence of Father's incarceration and his behavior while incarcerated supports the trial court's best interest finding under the second, fourth, and fifth *Holley* factors: the emotional and physical needs of the children now and in the future, Father's parental abilities, and the available programs to assist Father in promoting the best interest of the children. *See Holley*, 544 S.W.2d at 371–72. Here, the record supported a finding that Father was unable to provide for the children's emotional or physical needs now and in the future because he was incarcerated before the children were born; at the time of trial, he was scheduled to be released from prison seventeen months later; and he has an extensive history of reoffending. Father was also designated as a level G5 inmate because of assaults he committed during his incarceration, and he testified he was unable to have any phone calls or video chats with the children due to that status. The trial court could have considered the undisputed evidence of Father's failure to maintain contact with the children in making its best interest determination. Likewise, the trial court could have also considered Father's inability to participate or complete any of the court-ordered services required to secure reunification due to his status as a G5. *See id.*; *see also In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.).

Evidence of domestic violence in the home supports the trial court's best-interest finding under the third, fourth, and seventh *Holley* factors: the emotional and physical danger to the children now and in the future, Father's parental abilities, and stability of the

23

home. *See In re R.J.*, 579 S.W.3d 97, 116 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (citing *Holley*, 544 S.W.2d at 371–72). Here, the evidence showed that Father was convicted for strangling Mother during her pregnancy, which threatened the health and safety of Mother and the unborn children. "Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future." *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Given the evidence of Father's felony conviction for assaulting Mother, his criminal history and admission that he had committed many crimes of violence in the past, and his assaultive conduct while incarcerated, the trial court was permitted to infer that Father would continue his violent behavior in the future, further supporting the best-interest finding. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (12)(D)–(E) (providing that courts may consider whether there is history of abusive or assaultive conduct by a child's family or others who have access to a child's home and whether adequate parenting skills are demonstrated by providing a child with a safe physical home environment and protection from repeated exposure to violence); *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (explaining that domestic violence, even when the child is not the intended victim, supports a finding that termination is in child's best interest).

"[P]arental substance abuse reflects poor judgment and may be a factor to consider in determining a child's best interest." *In re R.J.*, 579 S.W.3d at 117; *see also* TEX. FAM. CODE ANN. § 263.307(b)(8) (stating courts may consider history of substance abuse by a child's family or others who have access to a child's home). Father admitted that he used drugs with Mother and that he smoked marijuana during Mother's pregnancy.

24

Father also had prior convictions for possession of controlled substances and admitted that he knew Mother had a drug problem but did not seek to have her receive treatment for her substance abuse. This evidence supports the trial court's best-interest finding under the second and third *Holley* factors: the emotional and physical needs of the children now and in the future and the emotional and physical danger to the children now and in the future. *See Holley*, 544 S.W.2d at 371–72; *In re R.J.*, 579 S.W.3d at 117.

We acknowledge that some evidence exists in the record weighing against the best-interest findings. Regarding Father's plans for the children, Father stated that he planned to move in with his grandparents in Corpus Christi upon his release from prison and work at restaurants or construction. Father also stated that he planned for the children to live with him once he got his own house or apartment. In addition, Father completed the Voyagers program while in prison, which he stated was a "class where you learn character, forgiveness, parenting, drug addiction." Nonetheless, evidence cannot be read in isolation and must be read in the context of the entire record. *See In re R.J.*, 579 S.W.3d at 119. In termination cases, it is the sole province of the factfinder to weigh the credibility of witnesses. *See In re S.L.*, 188 S.W.3d 388, 394 (Tex. App.—Dallas 2006, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (explaining that the factfinder "is the sole judge of the credibility of witnesses and the weight to be given to their testimony")). Here, the balance of the record evidence demonstrates that Father is unable to meet the current and future physical and emotional needs of the children, is unable to protect the children from current and future emotional and physical danger, lacks key parenting abilities, and lacks stability.

After viewing all the evidence in the light most favorable to the best-interest findings, we conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Father and the children was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.P.B.*, 180 S.W.3d at 573. We also conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's findings that termination of the parent-child relationship between Father and the children was in the children's best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in the children's best interest. *See In re M.C.T.*, 250 S.W.3d at 168. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship between Father and the children was in the children's best interest. *See In re J.P.B.*, 180 S.W.3d at 573; *In re M.C.T.*, 250 S.W.3d at 168. We overrule Father's issue as it relates to the best interest finding.

## III. CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Delivered and filed on the
25th day of July, 2024.

26